997 A.2d 1118 (2010)
414 N.J. Super. 238
Donald C. BAYER, Jr., Plaintiff-Appellant,
v.
TOWNSHIP OF UNION, New Jersey, Officer Christopher Donnelly, Officer Robert Donnelly, III, Officer Edward Koster[1], Officer Thomas Ollemar, Officer Carlos Turner, Sergeant Marc A. Bruno, Sergeant J. Dilginis[2], Sergeant Shawn Herrighty, Detective William Fuentes, Detective Thomas Ronan[3], Detective Gregory Rossi, Detective Lieutenant Ronald Berry, and Captain Edward Shapiro[4], Defendants-Respondents.
DOCKET NO. A-1482-07T2.
Superior Court of New Jersey, Appellate Division.
Submitted May 11, 2009.
Decided July 7, 2010.
*1122 Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Newark, for appellant (John J. Shotter, of counsel and on the brief).
Weiner Lesniak, LLP, Parsippany, for respondent Township of Union (Alan J. Baratz, of counsel and on the brief).
Hoagland, Longo, Moran, Dunst & Doukas, LLP, New Brunswick, for respondents Officer Christopher Donnelly, Officer Robert Donnelly III, Officer Edward *1123 Koster, Officer Thomas Ollemar, Officer Carlos Turner, Sergeant Marc A. Bruno, Sergeant J. Dilginis, Sergeant Shawn Herrighty, Detective William Fuentes, Detective Thomas Ronan, Detective Gregory Rossi, Detective Lieutenant Ronald Berry and Captain Edward Shapiro (Christopher J. Killmurray, of counsel; Matthew G. Rosenfeld, on the brief).
Before Judges CARCHMAN, R.B. COLEMAN and SABATINO.
The opinion of the court was delivered by
R.B. COLEMAN, J.A.D.
Plaintiff Donald C. Bayer, Jr. was arrested for a bank robbery he did not commit, based on a bank teller's misidentification of him at a showup conducted by the Union Township Police Department (the Department) shortly after the crime. Plaintiff sued Union Township (the Township) and the individual police officers involved for false arrest and false imprisonment under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3(TCA), and for violation of his constitutional rights pursuant to 42 U.S.C.A. § 1983. His TCA claims were dismissed after his motion to file a late notice of claim was denied, and his section 1983 claims were dismissed on summary judgment after the court found that there was probable cause for the arrest and that, alternatively, the police officers enjoyed qualified immunity. We affirm.

I.
On the morning of December 19, 2003, Odete Luis was working as head teller at the NorCrown Bank on Colonial Avenue in Union Township. A man walked up to her window and gave her a bag with a note that read: "PLACE ALL THE MONEY IN THE BAG. NO DYE, TEAR GAS OR BAIT MONEY. YOU HAVE 10 SECONDS." According to the statement that Luis subsequently gave to Detective Gregory Rossi at headquarters, the robber was a short white male, approximately five feet five inches tall, and between nineteen and twenty-three years of age. He was wearing a blue windbreaker jacket and a blue baseball cap pulled down over his eyes. When he raised his head, Luis saw that he had "mean eyes." He was clean-shaven, and Luis did not recall having seen him in the bank before. After Luis put the money from both her drawers into the man's bag and gave it to him, he quickly left the bank. Luis then yelled to her manager that she had been robbed and pushed the security button.
Kimberly Cornacchia was working at the drive-up window that day. Prior to the robbery, she had observed the robber walking down the street toward the bank. She noticed him because he looked like a "thug"; however, she did not notice anything out of the ordinary while he was in the bank. After Luis said she was robbed, Cornacchia called 9-1-1.
The Union Township Police Department received the call at 9:23 a.m. and broadcast it over the radio to its officers. Officer Edward Koster was the first to arrive at the scene of the crime. He spoke to Luis and Cornacchia and to the bank manager, Lu Vallejo. Detective Lieutenant Ronald Berry also responded to the scene and was the ranking supervisor in charge of the investigation. He was present when Luis gave her description of the robber, which was largely consistent with the description she later gave in her statement at headquarters. Both Koster and Rossi questioned Luis.
At about 9:30 a.m., Officer Christopher Donnelly was in a patrol car when he was "high-beamed" by a driver, who identified himself as Willie Coley, an off-duty police detective from Orange, and asked if a bank robbery had just occurred. Coley related *1124 to C. Donnelly[5] that he had just been at NorCrown Bank to use its ATM and had noticed a white male wearing a baseball hat with money stuffed in his pockets. Coley told C. Donnelly that the man fled in an older model midsize gray or black vehicle.
According to the formal statement that Coley later gave to Sergeant Joseph Dilginis, he had observed money coming out of the top of a bag that the man was holding. The man turned his head away from Coley, walked past him and then got into a dark-colored vehicle approximately one hundred yards away on Colonial Avenue.
C. Donnelly broadcast the information that he received from Coley to other units on the road. About thirty minutes later, Hillside Township police detained a suspect at a location approximately four to five minutes from the bank by car. Union Township Officers Thomas Ollemar and Peter Simon were dispatched to that location in Hillside and stayed until Sergeant Shawn Herrighty arrived. The Hillside officers who were with plaintiff told Herrighty that they had been on patrol when they saw a car matching the description given over the broadcast. When they pulled up behind it, the driver, later determined to be plaintiff, took off one hat and put on a different type of hat. They ultimately detained him.
According to plaintiff, he left his house at approximately 9:25 a.m. that morning, driving a 1989 gray Chevy Caprice. He was wearing gray sweatpants, a red sweatshirt, sneakers, a dark blue winter coat, and a blue winter cap. As he observed a Hillside police car coming up behind him, he removed his cap, merely as a nervous reaction. Although there was a green baseball cap with a Sierra Mist logo on the front seat of his car, plaintiff had not worn it that day.
According to Berry, he, Rossi, and Captain Edward Shapiro, made the decision to have the three witnessesLuis, Cornacchia, and Coleytransported to the Hillside location where plaintiff was detained to see if they could identify him as the robber. According to Shapiro, who was the most senior officer at the scene but not the officer in charge of the investigation, it was "standard operating procedure" to take a witness to view a suspect if the suspect has been stopped "right after a crime." Although Shapiro was not sure if that standard procedure was written down anywhere, he claimed that he had been trained that way and that the case law supported it.
Shapiro maintained that a "fresh crime" required the prompt display of a suspect to a witness. He defined a fresh crime as one where the crime had just occurred, the suspect had fled and then someone was apprehended "within tens of minutes."
Three separate Union Township police officers transported each of the three witnesses to Hillside to view plaintiff. Plaintiff was wearing handcuffs during the entire showup procedure. He stood next to Herrighty in front of a patrol unit. Although Herrighty did not recall if plaintiff was required to wear a baseball cap, plaintiff claimed that he was required to wear the cap that was found in the front seat of his car. Plaintiff also claimed that, during the procedure, one of the officers on the scene walked arm-in-arm with him for about twenty feet.
Berry was assigned to take Luis to the showup. According to his deposition testimony and his police report, he told Luis *1125 while they were en route that she should not feel obliged to identify anybody and that the suspect may or may not be the robber. He also told her to take her time, and he tried to calm her down.
When Berry arrived at the Hillside location, he parked his car about a block away from where plaintiff was situated. He got out of his car to speak to the officers on the scene to determine how the showup was going to be conducted. According to Berry, when he returned to his car, Luis exclaimed, "Oh, my God, that's him. I can't believe you got him so quick." Berry told Luis to take her time and then drove closer to the suspect. After viewing him from a distance of approximately fifteen or twenty feet (a distance that was corroborated by Herrighty), Luis said that plaintiff was the robber, except that his clothes were different. According to Berry, Luis was sure it was him because he had the "same face and those eyes." In the formal signed statement Luis gave to Rossi at headquarters shortly after this identification, Luis stated that she was ninety percent sure that the suspect was the robber.
At her deposition taken on March 15, 2007, more than three years after the robbery, Luis recalled that the police told her that they had found somebody that matched the robber's description, and they wanted to see if she could recognize him. She did not remember what she may have said at the time of confrontation. In particular, she did not remember whether she exclaimed: "Oh, my God, that's him!" She did remember saying that it looked like him, especially the way he was wearing the cap on his head and the way he was walking. Luis recalled that she told Berry: "I don't want to say something that somebody can go to jail if it's not the person." Luis claimed in her deposition that she was not confident that plaintiff was the robber and that she conveyed that lack of confidence to the police. Specifically, she said she told both Berry on the scene and Rossi back at headquarters that she was not one hundred percent sure.
Sergeant Marc Bruno was assigned to take Cornacchia to the Hillside location. Cornacchia told Bruno that she could not identify plaintiff as the person who robbed the bank, and Bruno conveyed that fact to Berry. As Bruno turned his car around to take Cornacchia back to the bank, she asked him, "Is that Don Bayer?" When Bruno asked how she knew him, she said that he was a bank customer and also had been a substitute teacher when she was in high school. Bruno believes that he relayed that information to Rossi. Cornacchia also gave an official statement in which she confirmed that she could not identify plaintiff as the robber at the showup.
C. Donnelly was assigned to take Coley to the Hillside location. Donnelly pulled his car close enough so that Coley could get a clear view of plaintiff, who was leaning up against the trunk of his vehicle. Coley was able to positively identify the vehicle, but said that plaintiff might "possibly" be the robber. According to the formal statement that Coley gave a short time later, plaintiff did not have a hat on and appeared older than the robber, but his jacket and physical appearance were the same. Coley was "pretty sure" it was the same vehicle and claimed that he was able to positively identify it.
Following the showups, Officers Carlos Turner and Robert Donnelly transported plaintiff to headquarters and read him his rights. According to R. Donnelly's arrest report, plaintiff had straight, collar-length hair, a pale complexion, and a thin build. He was five feet ten inches tall, weighed 160 pounds, and was thirty-seven years old. According to Officer Turner's property report, plaintiff had $47 in cash on his person when arrested.
*1126 Later that afternoon, Rossi and Officer Thomas Ronan conducted a search of the house where plaintiff lived with his mother, after obtaining his mother's consent. The officers did not find any cash in the house; nor did they find a blue jacket or a blue baseball hat.
After returning to headquarters, at approximately 2:00 p.m., Rossi signed a complaint warrant charging plaintiff with second-degree robbery, relying on the oral statements of the officers involved in the case. He did not read their official reports until later. Rossi also relied on the statement that Luis provided at headquarters, in which she said she was ninety percent certain that plaintiff was the robber.
Rossi admitted that he had no knowledge of how the showups had been conducted. Although he was aware of Luis's initial description of the robber, Rossi never actually looked at plaintiff before signing the complaint to see if he fit that description. According to Rossi, the fact that Luis made a positive identification was more important than her verbal description of the suspect. In addition, Rossi relied on the fact, which he learned from Berry, that plaintiff had made a statement to R. Donnelly that he had been at the bank earlier in the day (plaintiff later claimed he never made that statement).
After Rossi signed the complaint warrant, he read Roster's report and determined that certain inconsistencies in the investigation deserved further inquiry. He decided to undertake a reassessment of the evidence and reviewed a compact disc version of the bank's videotape of the robbery. Earlier that day, Rossi had viewed the security tape at the bank with the bank's security officer but had not been able to zoom in on the robber. Once he was able to zoom in on the perpetrator's face, Rossi immediately noticed that the robber had short hair, whereas plaintiff had longer hair.
Rossi conveyed his doubts to Berry and another superior officer. He also called a judge, who instructed him to call the county prosecutor. The assistant prosecutor told Rossi to release plaintiff on his own recognizance and to set up a polygraph test. At approximately 8:30 p.m., Rossi took a statement from plaintiff and told him about the doubts the police were having. Plaintiff said he was willing to take a polygraph test. The police then released plaintiff.
According to plaintiff, several days after he was released, he spoke to a lawyer, who told him not to submit to a polygraph test given by the police. Instead, plaintiff took a polygraph test at his lawyer's office but did not immediately give the results to the police. Rossi made numerous unsuccessful attempts to set up a polygraph test, and on February 6, 2004, Rossi received a call from plaintiff's attorney, who said he would contact the assistant prosecutor to discuss the polygraph test. On March 24, 2004, plaintiff's lawyer advised him that the prosecutor would drop the charges against him if he took another polygraph test and passed it. However, some time in May, the prosecutor agreed to look at the results from the test plaintiff had already taken. On June 26, 2004, the prosecutor filed a notice of dismissal and closed the case.[6]
On September 24, 2004, plaintiff filed a notice of claim with the State, Union County, the Union County Prosecutor's Office, Union Township, and Hillside Township, advising these entities of his claims for false arrest, false imprisonment, malicious prosecution, and negligent infliction of *1127 emotional distress as the result of an incident that occurred on December 19, 2003. On December 17, 2004, these parties appeared before Judge John F. Malone on plaintiff's motion for leave to file a late notice of claim. The parties recognized that the motion pertained only to plaintiff's ability to pursue a state law claim for false arrest. After hearing argument, Judge Malone denied the motion.
On the same day, plaintiff filed a complaint in Superior Court, Law Division, Union County, against the State of New Jersey, Union County, Union Township, and Hillside Township, alleging violation of his federal civil rights pursuant to 42 U.S.C.A. § 1983, violation of his state civil rights pursuant to N.J.S.A. 10:6-2, malicious prosecution, and false arrest. In its answer, the Township asserted that plaintiff's claim for false arrest was barred by his failure to comply with the notice provisions of the TCA, in accordance with Judge Malone's order.
On April 25, 2005, plaintiff filed an amended complaint, which asserted the same claims against the original defendants, but also added the Union County Prosecutor's Office as a public entity defendant and added thirteen Union Township police officers and four Hillside Township police officers as individual defendants. On May 5, 2006, the parties apparently stipulated as to the dismissal of defendant Detective William Fuentes, one of the Union Township police officers; however, Fuentes was named as a defendant on the notice of appeal subsequently filed.
Plaintiff moved to compel the Township to produce personnel files and internal affairs complaints against the individually named police officers. Judge Ross R. Anzaldi heard argument on that motion and entered an order requiring the Township to provide plaintiff with some of the documents and requiring that others be delivered to the court for an in camera review. On October 23, 2006, Judge Anzaldi ruled that none of the documents he reviewed in camera needed to be provided to plaintiff. On December 15, 2006, after hearing argument on plaintiff's motion for reconsideration of this ruling, the judge denied the motion.
Thereafter, Judge Anzaldi heard argument on the summary judgment motions brought by the Township and the individual Union Township police officers named in this appeal.[7] The court granted the motions as to the named defendants and signed an order granting summary judgment and dismissing the claims against all the individual police officers: Officers C. Donnelly, R. Donnelly, Koster, Ollemar, and Turner; Sergeants Bruno, Dilginis, and Herrighty; Detectives Fuentes, Ronan, and Rossi; Detective Lieutenant Berry; and Captain Shapiro. On October 5, 2007, the court granted the Township's motion for summary judgment. On November 15, 2007, Judge Anzaldi denied plaintiff's motion for reconsideration of the orders granting summary judgment.
Plaintiff filed a notice of appeal from Judge Malone's order of December 17, 2004, and from Judge Anzaldi's orders of September 20, 2007, October 5, 2007, and November 15, 2007. Plaintiff contends that disputed issues of fact should have precluded the court from granting summary judgment and that the trial court wrongfully denied discovery, which plaintiff believes would have established a policy or custom of following improper investigative procedures.
*1128 In support of that contention, plaintiff points to evidence demonstrating that all of the individual defendants who were deposed in this case admitted that they had been trained on how to conduct identification procedures, but not necessarily on how to conduct a showup. Their training occurred either when they were at the police academy or from informal sessions conducted at police headquarters, especially when new guidelines from the Attorney General or prosecutor were issued. These defendants admitted that they had never conducted a live lineup procedure (as opposed to a showup, in which the police present a single suspect to the witness), and that the Department had no facility in which to conduct a live lineup. These officers further admitted that only detectives conducted photo arrays.
In addition, Captain Ricky Landolfi, who was in charge of administration for the Department, admitted that the Department had no regulation, written policy, or informal policy regarding how showups were to be conducted, and that there was no formal training regarding showups. He maintained that if there was a need to establish probable cause for an arrest, then a showup should be done on the street.
Francis Murphy, plaintiff's law enforcement expert, submitted a report in which he concluded that there were no exigent circumstances in this case that mandated an immediate showup of plaintiff to the witnesses. In addition, he opined that the suggestive nature of the showups failed to meet the procedural safeguards promulgated by the International Association of Chiefs of Police, the United States Attorney General, and the New Jersey Attorney General. Murphy also faulted Rossi for not knowing the circumstances under which the showups were conducted before signing the complaint.
Murphy also expressed his opinion that the police charged plaintiff "absent any credible evidence of his involvement in the robbery." He believed that the police should have looked at the enhanced version of the bank surveillance tape before charging him. He claimed that the police ignored evidence that should have excluded plaintiff as a suspect.

II.
Plaintiff argues on appeal that the court wrongfully denied his motion to file a late tort claims notice because there were extraordinary circumstances justifying the delay and because defendants would not have been substantially prejudiced by the late filing. We disagree.
According to pertinent provisions of N.J.S.A. 59:8-8:
A claim relating to a cause of action for death or for injury or damage to person or to property shall be presented as provided in this chapter not later than the ninetieth day after accrual of the cause of action. After the expiration of six months from the date notice of claim is received, the claimant may file suit in an appropriate court of law. The claimant shall be forever barred from recovering against a public entity or public employee if:
a. He failed to file his claim with the public entity within 90 days of accrual of his claim except as otherwise provided in section 59:8-9. . . .
Pursuant to N.J.S.A. 59:8-9, a failure to comply with the provisions of N.J.S.A. 59:8-8 is only forgiven upon a showing of "extraordinary circumstances":
A claimant who fails to file notice of his claim within 90 days as provided in section 59:8-8 of this act, may, in the discretion of a judge of the Superior Court, be permitted to file such notice at *1129 any time within one year after the accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby. Application to the court for permission to file a late notice of claim shall be made upon motion supported by affidavits based upon personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances for his failure to file notice of claim within the period of time prescribed by section 59:8-8 of this act or to file a motion seeking leave to file a late notice of claim within a reasonable time thereafter; provided that in no event may any suit against a public entity or a public employee arising under this act be filed later than two years from the time of the accrual of the claim.
The purposes of these notice provisions are to: allow the public entity sufficient time to settle claims prior to the commencement of suit; give the public entity prompt notification so that it may investigate the facts while they are still fresh; afford the public entity the chance to correct the conditions which gave rise to the claim; and inform the public entity in advance of any liability it may incur. Beauchamp v. Amedio, 164 N.J. 111, 121-22, 751 A.2d 1047 (2000). "In determining whether a notice of claim under N.J.S.A. 59:8-8 has been timely filed, a sequential analysis must be undertaken." Id. at 118, 751 A.2d 1047. First, it must be determined when the claim accrued. Ibid. Next, it must be determined whether a notice of claim was filed within ninety days. If not, it must be determined whether extraordinary circumstances justify the late notice. Id. at 118-19, 751 A.2d 1047.
The TCA defines "accrual" as "the date on which the claim accrued." N.J.S.A. 59:8-1. In the case of tortious conduct, the date of accrual is the date of the incident on which the tortious conduct took place. Beauchamp, supra, 164 N.J. at 117, 751 A.2d 1047. "The basis for a claim of false arrest arises at the time the incident occurs, i.e., the time of arrest." Bauer v. Borough of Cliffside Park, 225 N.J.Super. 38, 47, 541 A.2d 719 (App.Div.), certif. denied, 113 N.J. 330, 550 A.2d 447 (1988). "[A] requirement that the criminal proceeding has terminated in plaintiff's favor is not a prerequisite for institution of an action for false arrest[.]" Pisano v. City of Union City, 198 N.J.Super. 588, 593, 487 A.2d 1296 (Law Div.1984).
Where a claim is not filed within ninety days of accrual, a court must determine whether the plaintiff alleged extraordinary circumstances justifying the delay and whether the public entity or employee will be substantially prejudiced by the delay. Lamb v. Global Landfill Reclaiming, 111 N.J. 134, 146-47, 543 A.2d 443 (1988). "The granting or denial of permission to file a late claim . . . is a matter left to the sound discretion of the trial court, and will be sustained on appeal in the absence of a showing of an abuse thereof." Id. at 146, 543 A.2d 443. However, an appellate court will "examine `more carefully cases in which permission to file a late claim has been denied than those in which it has been granted[.]'" Feinberg v. N.J. Dep't of Envtl. Prot., 137 N.J. 126, 134, 644 A.2d 593 (1994) (quoting S.E.W. Friel Co. v. N.J. Tpk. Auth., 73 N.J. 107, 122, 373 A.2d 364 (1977)). Any doubts should be resolved in favor of the application so that cases may be heard on their merits. Ibid.
The requirement of "extraordinary circumstances" was added to the statute in 1994, with the purpose to "raise the bar for the filing of late notice" to a "`more demanding'" standard. Beauchamp, supra, 164 N.J. at 118, 751 A.2d 1047 (quoting Lowe v. Zarghami, 158 N.J. 606, 625, 731 A.2d 14 (1999)). The 1994 amendment *1130 "`may have signaled the end to a rule of liberality' in filing." Ibid. (quoting Lowe, supra, 158 N.J. at 626, 731 A.2d 14). "Ignorance of the 90-day statutory requirement, ignorance of one's rights or mere ambivalence by the claimant have never been found to be sufficient reasons on their own to allow late filing." Escalante v. Twp. of Cinnaminson, 283 N.J.Super. 244, 250, 661 A.2d 837 (App.Div.1995). Although an attorney's negligence may have been sufficient prior to the 1994 amendment to allow a late filing, under the current version of the statute, if such negligence is the sole basis for the late notice, the claim against the public entity will be lost. Zois v. N.J. Sports & Exposition Auth., 286 N.J.Super. 670, 674, 670 A.2d 92 (App.Div.1996).
The undisputed facts established that plaintiff was arrested on December 19, 2003, that he was released the same day, that the complaint against him was dismissed on June 30, 2004, and that his notice of claim was filed on September 24, 2004. In denying plaintiff's motion, the court noted that plaintiff was asserting three reasons for his late notice: (1) his concern having the criminal charge dismissed before he could file the notice of claim; (2) his desire not to antagonize law enforcement officials while his criminal charge was still pending; and (3) his belief, based on the advice of his prior counsel, that his cause of action did not accrue until the criminal charge was resolved.
As noted above, the law is well settled that a claim for false arrest accrues on the date of the arrest. Bauer, supra, 225 N.J.Super. at 47, 541 A.2d 719. Hence, it is without dispute that plaintiff's claim was filed beyond the ninety-day period. We agree with the trial court that plaintiff's desire to obtain a dismissal of the criminal charge before filing a notice of claim and his desire not to aggravate law enforcement officials did not constitute extraordinary circumstances so as to excuse his late filing. This was not a situation where plaintiff was incarcerated, disabled, or otherwise physically incapable of protecting his rights during the ninety-day period following accrual. He was at liberty during the entire time. We hold that plaintiff's reluctance to aggravate law enforcement officials reflects ambivalence about filing a claim. It is well established that "indecision" or "mere ambivalence" about whether to prosecute a claim do not constitute extraordinary circumstances necessary to create a basis for relief. Lutz v. Twp. of Gloucester, 153 N.J.Super. 461, 466, 380 A.2d 280 (App.Div.1977). Accordingly, we reject defendant's first two arguments on that basis.
Plaintiff further argues that extraordinary circumstances arose out of the fact that his prior counsel misled him into believing that his claim did not accrue until the criminal complaint was dismissed. Plaintiff relies on Beauchamp, where the plaintiff had been injured in an accident with a New Jersey Transit bus and was advised by his attorney "not to file a notice of claim under the [TCA] because her injuries did not appear serious enough to satisfy the permanency requirements necessary to recover non-economic damages" under the statute. Supra, 164 N.J. at 114, 751 A.2d 1047. After the injuries revealed themselves to be more severe than originally believed, the plaintiff moved to file a late notice of claim and was denied relief. Id. at 115, 751 A.2d 1047.
The Supreme Court held that the plaintiff had, in fact, demonstrated "extraordinary circumstances" due to the confusion surrounding how the permanency requirement affected the issue of accrual at the time that the plaintiff consulted with her attorney. Id. at 122-23, 751 A.2d 1047. The Court emphasized that the plaintiff's attorney had relied on a published Appellate *1131 Division case that had rulederroneously according to the Beauchamp Courtthat a claim does not accrue until medical evidence of permanency is obtained. Id. at 120-21, 751 A.2d 1047. The Court emphasized that extraordinary circumstances were present due to the "general confusion among lawyers and judges" relative to the concept of accrual, "including a published Appellate Division opinion[.]" Id. at 123, 751 A.2d 1047.
We are convinced that plaintiff's reliance on Beauchamp is misplaced. Unlike the attorney in Beauchamp, plaintiff's prior counsel here did not rely on a published Appellate Division opinion in giving his client wrong advice regarding accrual. Nor was this a case where there was general confusion among attorneys and judges regarding accrual of a cause of action for false arrest. Hence, this case is more akin to general claims of ignorance of the law and attorney negligence, neither of which have been held to constitute extraordinary circumstances so as to justify a late filing.

III.
Plaintiff next argues that the court erred in dismissing his section 1983 claims against the individual officers because there were questions of fact that should have been submitted to a jury regarding whether defendants had probable cause to arrest him and whether defendants were entitled to qualified immunity. We reject that argument.
According to 42 U.S.C.A. § 1983:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
To establish a claim under this section, a plaintiff must prove that the "defendants acted under color of state law and deprived him of a well-established federal constitutional or statutory right." Wildoner v. Borough of Ramsey, 162 N.J. 375, 385, 744 A.2d 1146 (2000). A government official is entitled to qualified immunity from liability for civil damages under section 1983 unless his conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). A right is clearly established when it is sufficiently clear that a reasonable official would understand that his act violates that right. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987). It is not necessary for the plaintiff to prove that the precise act in question was previously held to be unlawful. Rather, the appropriate inquiry is whether the law was apparent in relation to specific facts confronting the defendants when they acted. Ibid.
Where the basis for a plaintiff's claim is false arrest or imprisonment, the existence of probable cause will be an absolute defense. Wildoner, supra, 162 N.J. at 389, 744 A.2d 1146. "The qualified immunity defense . . . `protects all officers but the plainly incompetent or those who *1132 knowingly violate the law.'" Bernstein v. State, 411 N.J.Super. 316, 340, 986 A.2d 22 (App.Div.2010) (quoting Connor v. Powell, 162 N.J. 397, 409, 744 A.2d 1158, cert. denied sub nom. Badgley v. Connor, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 251 (2000)). Accordingly, a police officer will be entitled to judgment if he can demonstrate either that he acted with probable cause or, "`even if probable cause did not exist, that a reasonable police officer could have believed in its existence.'" Schneider v. Simonini, 163 N.J. 336, 355, 749 A.2d 336 (2000) (quoting Kirk v. City of Newark, 109 N.J. 173, 184, 536 A.2d 229 (1988)).
Probable cause is "more than mere suspicion but less than legal evidence necessary to convict." Sanducci v. City of Hoboken, 315 N.J.Super. 475, 480, 719 A.2d 160 (App.Div.1998). It is a "well-grounded" suspicion that an offense has been committed. State v. Moore, 181 N.J. 40, 45, 853 A.2d 903 (2004). "Probable cause exists where `the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1310-11, 93 L.Ed. 1879, 1890 (1949) (alterations in original) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925)); accord, Moore, supra, 181 N.J. at 46, 853 A.2d 903. In determining whether probable cause existed, a court should consider the "totality of the circumstances," Moore, supra, 181 N.J. at 46, 853 A.2d 903, including the police officer's "`common and specialized experience.'" Schneider, supra, 163 N.J. at 362, 749 A.2d 336 (quoting State v. Contursi, 44 N.J. 422, 431, 209 A.2d 829 (1965)).
In this case, the trial court found that, based on the positive identification of plaintiff made by Luis and the positive identification of plaintiff's car by Coley, the police officers had probable cause or, at least, a sufficient basis to believe that probable cause existed to arrest plaintiff and to charge him with bank robbery. Plaintiff nevertheless asserts that summary judgment was inappropriate because there were factual questions regarding whether Luis positively identified him and regarding whether the showup procedure was conducted in an impermissibly suggestive manner. We reject this argument.
The case law is clear that probable cause and qualified immunity are legal questions to be decided by a judge, and not a jury. Qualified immunity is an immunity from suit rather than a defense to liability; the benefit of the immunity is effectively lost if the case is allowed to go to trial. Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411, 425 (1985). Thus, "a defendant's entitlement to qualified immunity is a question of law to be decided [as] early in the proceedings as possible, preferably on a properly supported motion for summary judgment[.]" Wildoner, supra, 162 N.J. at 387, 744 A.2d 1146. Where probable cause is the issue, the trial judge should decide "whether probable cause existed as a matter of law, and if not, whether the [defendant] could have reasonably believed in its existence." Schneider, supra, 163 N.J. at 359, 749 A.2d 336. However,
[w]here historical or foundational facts that are critical to those determinations are disputed, the jury should decide those disputed facts on special interrogatories. The jury's role should be restricted to the who-what-when-where-why type of historical fact issues. Based on the jury's factual findings, the trial judge must then make the legal *1133 determination of whether qualified immunity exists.
[Ibid. (internal quotation and citation omitted.)]
Here, plaintiff argues that there were critical facts in dispute regarding what Luis said and did when she identified him at the showup. For example, Luis acknowledged at her subsequent deposition that she did not remember exclaiming "Oh my God, that's him, I can't believe you got him so quickly" at the showup. Luis also stated that she was not certain of her identification of plaintiff at the time she made it. She believed that she had conveyed that uncertainty to the police.
These disputed facts do not directly challenge those relied upon by the trial court, however. Critically, plaintiff has never challenged the fact that on the day of plaintiff's arrest Luis provided a statement to police expressing that she was ninety percent certain about her identification of plaintiff as the robber. Luis provided a statement directly to Rossibefore Rossi signed the complaint against plaintiffin which she recounted that she immediately identified plaintiff when she was driven to the Hillside location and that, after getting closer, she was ninety percent sure that plaintiff was the man who robbed her. Hence, even if Luis later recanted her identification in its entirety, the fact remains that her ninety percent certainty provided Rossi with a reasonable basis for believing that probable cause existed when he signed the complaint. As the trial court properly noted, probable cause is determined at the time the police officer acts, and not on the basis of twenty-twenty hindsight.
Plaintiff also argues that because the showup identification procedure was impermissibly suggestive, his arrest, which was premised on the identification, deprived him of his constitutional rights and gives rise to police liability under section 1983. Plaintiff believes the identification was impermissibly suggestive because he was in handcuffs, standing next to a patrol car and at least one police officer, and was forced to wear a hat that was similar to the one worn by the robber. He argues that these procedures violated the Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures (Guidelines), which appear in the appendix to our Supreme Court's opinion in State v. Herrera, 187 N.J. 493, 511-20, 902 A.2d 177 (2006).
At the outset, we note that although the guidelines apply to both photographic and live lineups, they do not specifically address showups. Ibid. Consequently, we need not apply the presumption of impermissible suggestiveness for departures from the Guidelines, as we did in State v. Henderson, 397 N.J.Super. 398, 415, 937 A.2d 988 (App.Div.), certif. granted and denied, 195 N.J. 521, 950 A.2d 907 (2008), remanded by 2009 WL 510409, 2009 N.J. Lexis 45 (Feb. 26, 2009) (order remanding for a hearing before Special Master to determine whether the Brathwaite test "remain[s] valid and appropriate in light of recent scientific and other evidence[.]").[8] Nor do we need to address whether the Henderson presumption, which was designed for criminal cases, has any applicability to a civil action such as the present matter.
The admissibility of showup evidence is governed by the same two-step analysis applicable to any identification procedure, as set forth in Manson v. Brathwaite, 432 U.S. 98, 110, 97 S.Ct. 2243, *1134 2251, 53 L.Ed.2d 140, 151 (1977). Herrera, supra, 187 N.J. at 503-04, 902 A.2d 177. Under that analysis, a court first determines whether the procedure was impermissibly suggestive, and then determines whether the identification was nevertheless reliable. Even if the showup was impermissibly suggestive, evidence derived from the showup is admissible if the indicia of reliability outweigh the suggestiveness of the procedure. Id. at 503-04, 902 A.2d 177. Factors to consider in determining reliability include the witness' opportunity to view the suspect when the crime was committed, the degree of attention paid by the witness, the accuracy of the witness' initial description of the suspect, the level of certainty demonstrated by the witness, and the length of time between the crime and the identification. Id. at 503, 902 A.2d 177. Reliability is the lynchpin of the analysis. Ibid.
In the present case, the trial court found that the critical inquiry was not whether the out-of-court identification on which the police relied in arresting plaintiff complied with the two-step analysis governing its admissibility at trial, but rather whether the officers reliance upon it in developing probable cause was reasonable. In other words, it concluded that an impermissibly suggestive showup does not automatically give rise to police liability if the plaintiff was detained based on evidence obtained in the improper showup. Though we have not had occasion to rule on this precise issue, we find that the trial court applied the proper analysis.
Several federal courts have reached the same conclusion. In Hensley v. Carey, the Seventh Circuit affirmed the dismissal on summary judgment of a section 1983 action in which the plaintiff asserted that his due process rights were violated by a suggestive identification procedure that led to his wrongful arrest. 818 F.2d 646, 646 (7th Cir.), cert. denied, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 395 (1987). In doing so, the court held that the constitutional rule enunciated in Brathwaite is "a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that should be actionable under § 1983." Id. at 649. The purpose of the Brathwaite rule, according to the Seventh Circuit, is to "insure that only reliable identification evidence is admitted at trial. [It] . . . does not establish a right to an impartial lineup so long as the evidence gained through that lineup is not used at trial." Id. at 650.
In Pace v. City of Des Moines, the Eighth Circuit, on similar facts, held that "in the context of unduly suggestive lineups, only a violation of the core rightthe right to a fair trialis actionable under § 1983." 201 F.3d 1050, 1055 (8th Cir. 2000). The court considered the Brathwaite factors in the context of the allegedly suggestive lineup procedure, but only to answer the ultimate question of whether the eyewitness identification that resulted from the procedure "was sufficiently probative to allow a reasonable officer to believe that probable cause existed." Id. at 1057; cf. Torres v. City of Los Angeles, 548 F.3d 1197, 1209 (9th Cir.2008) (reversing a grant of summary judgment entered against a plaintiff who brought a section 1983 claim alleging that his rights had been violated in part by an unduly suggestive identification procedure because the procedure was insufficiently reliable for a reasonable officer to have determined that probable cause existed), cert. denied, ___ U.S. ___, 129 S.Ct. 1995, 173 L.Ed.2d 1086 (2009).
Applying these principles here, we are satisfied that plaintiff's section 1983 claim, premised as it was on an allegation that defendants lacked probable cause to charge him with robbery and therefore *1135 violated his Fourth Amendment rights, was appropriately dismissed. Though plaintiff frames his argument within the context of the purportedly suggestive showup, the standard for qualified immunity is one of "objective reasonableness, which is a lesser standard than required for probable cause." Schneider, supra, 163 N.J. at 365, 749 A.2d 336. It has been observed that "[t]he only time that standard is not satisfied is when, `on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" Id. at 366, 749 A.2d 336 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278 (1986)).
Accepting the facts in the light most favorable to plaintiff, as we must on a summary judgment motion, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995), we hold that a reasonable officer would have concluded that a warrant should issue if confronted with the facts known by the various officers. Even though plaintiff's showup may have been somewhat suggestive plaintiff was placed before the witness in handcuffs and was purportedly forced to wear a hat found in his possession that resembled the robber's (which arguably gave the witness less of a chance to ascertain the plaintiff's physical features)it was not extraordinarily so.
We reach that conclusion because plaintiff has not alleged that the officers used suggestive language when presenting him to either of the identifying witnesses, because the positive identifications occurred a short time after the crime, and because it appears that the prompt roadside showup was motivated by a desire not to detain an innocent person. See State v. Romero, 191 N.J. 59, 78, 922 A.2d 693 (2007). Moreover, Luis was face-to-face with, and therefore had an excellent opportunity to view, the perpetrator at the time of the robbery; she later exhibited a high level of certainty (ninety percent) of her positive identification following the showup. We also note that the Supreme Court has noted the mere fact that a suspect is presented in or around a police car in handcuffs does not in itself make a showup impermissibly suggestive. Ibid.
More importantly, the officers responded reasonably in attempting to bring a fleeing bank robber to justice. Rossi, the officer who signed the complaint warrant at 2:00 p.m. on the day of the robbery, was the same officer who interviewed Luis at the police station two hours earlier and took her signed, sworn statement. In that statement (which is produced in the record in its entirety), Luis expressed none of the reservations that she allegedly expressed to Officer Berry at the showup. Rather, Luis indicated that she was ninety percent sure that plaintiff was the robber, based on her viewing of him at the showup. In Coley's sworn statement, he positively identified plaintiff's car as the vehicle used by the bank robber. Obviously, Coley's statement corroborated Luis's statement. We find that a reasonable police officer, when confronted with those statements, would have believed probable cause existed.
There was nothing unreasonable about the decision, allegedly made by Berry, Rossi, and Shapiro, to conduct an immediate showup after plaintiff's car was stopped by the Hillside Police. Showups are not per se violative of a defendant's constitutional rights, and they are often the most expedient way to exonerate a suspect. Romero, supra, 191 N.J. at 78, 922 A.2d 693. Unfortunately for plaintiff, he was not exonerated because he happened to be driving a car very similar to that driven by the bank robber and was positively identified by one of the eyewitnesses. That misfortune is not a basis for *1136 liability on the part of the arresting police officers.
Accordingly, we affirm the grant of summary judgment with regard to all of the individual defendants. The involvement of certain of them was plainly de minimis or innocuous. For example, defendant Turner did nothing more than transport plaintiff to headquarters from the Hillside location. Defendant Dilginis merely took a statement from Coley. Although defendant Ollemar reported to the Hillside location, he did not witness or participate in the showups. Defendant Ronan merely participated in a search of plaintiff's house, a search that plaintiff did not challenge.
While the involvement of the other officers was more complex, there is no evidence to support the view that any of them engaged in conduct that was not objectively reasonable under the circumstances. Even though some of the officers may have been aware of information that weakened the probable cause against plaintiff e.g., Cornacchia's statement that she recognized plaintiff as a bank customer, Luis's initial description of the robber as shorter and younger than plaintiff, or the fact that no physical evidence was discovered in plaintiff's car or home linking him to the crimenone of that evidence was dramatic enough to call the whole case against plaintiff into question at such an early stage, given the strength of the positive identifications. We find that plaintiff has not established that any of the officers received information or engaged in conduct that would have caused a reasonable officer to sound bells of alarm about the investigation or the reliability of the showup.

IV.
We also reject plaintiff's contention that the summary judgment entered in favor of the Township should be reversed. A local governmental entity is deemed a "person" under section 1983 only where the action alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611, 635 (1978); accord Stomel v. City of Camden, 192 N.J. 137, 145, 927 A.2d 129 (2007). It is not, however, liable for the actions of its employees solely on a theory of respondeat superior. Stomel, supra, 192 N.J. at 145, 927 A.2d 129. It is only when "execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." Monell, supra, 436 U.S. at 694, 98 S.Ct. at 2037-38, 56 L.Ed.2d at 638. The "official policy" requirement of Monell was intended to limit a municipality's liability to actions for which the municipality is actually responsible, i.e., acts which the municipality officially sanctioned or ordered. Stomel, supra, 192 N.J. at 145-46, 927 A.2d 129.
"[T]here are limited circumstances in which an allegation of a `failure to train' can be the basis for liability under § 1983." City of Canton v. Harris, 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412, 426 (1989). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388, 109 S.Ct. at 1204, 103 L.Ed.2d at 426. "Only where a failure to train reflects a `deliberate' or `conscious' choice by a municipality .. . can a city be liable for such failure under § 1983." Id. at 389, 109 S.Ct. at 1205, 103 L.Ed.2d at 427.
In this case, plaintiff emphasizes deposition testimony of members of the Department indicating an absence of any policy or *1137 particularized training on how to conduct showup identifications. Plaintiff further urges that showup identification procedures are virtually automatic when a suspect is detained within a brief time after the commission of a crime. Accepting the premises of those arguments as true, they do not establish any link between the absence of valid procedures and the asserted violation of section 1983. Showup identifications are not per se violative of the suspect's statutory or constitutional rights; and where, as here, the actions of the police are based upon the witness' assessment (to an estimated ninety percent certainty) that the suspect is the perpetrator, there is no basis to withhold or to overturn summary judgment in favor of the Township.

V.
Plaintiff argues that he was wrongfully denied discovery that was critical to his claims against the Township. We disagree.
On October 23, 2006, Judge Anzaldi wrote to both parties after having reviewed the psychological evaluations of defendants C. Donnelly, Koster, Herrighty, Ronan, and Berry, and the Internal Affairs complaints and investigative reports regarding the same. The judge was satisfied that "no information in the psychological evaluations, which found all officers fit for duty, nor in the Internal Affairs Complaints are worthy of discovery." The Internal Affairs complaints dealt with investigations of citizens' complaints "ranging from complaints as to demeanor, investigatory style and personality conflicts. In no instance do any pertain to inquiries of false arrest, imprisonment nor violation of anyone's civil rights."
On December 15, 2006, Judge Anzaldi heard argument on plaintiff's motion for reconsideration of his ruling. The judge clarified that Internal Affairs complaints regarding "demeanor" meant that a police officer was accused of not being polite or comforting; no complaint had anything to do with violating a citizen's civil rights during arrest. Plaintiff, however, asserted that he had the right to look at how investigations into complaints were conducted. The court responded that this would be true only with respect to complaints that alleged improper arrest. The court had independently reviewed all of these files and found nothing of relevance to plaintiff's litigation. Accordingly, it found no basis for reconsidering its decision.
Our discovery rules are liberally construed in recognition of the principle that "justice is more likely to be achieved when there has been full disclosure and all parties are conversant with all available facts." In re Liquidation of Integrity Ins. Co., 165 N.J. 75, 82, 754 A.2d 1177 (2000). Although discovery includes the obtaining of any information, not otherwise privileged, that appears reasonably calculated to lead to the discovery of admissible evidence, R. 4:10-2(a), we have recognized that "the scope of discovery is not infinite." K.S. v. ABC Prof'l Corp., 330 N.J.Super. 288, 291, 749 A.2d 425 (App.Div.2000). Rather, it must be limited to information that is relevant to the subject matter at hand. Ibid. Relevant evidence is "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. The focus should be on "`the logical connection between the proffered evidence and a fact in issue[.]'" Integrity, supra, 165 N.J. at 82, 754 A.2d 1177 (alteration in original) (quoting State v. Hutchins, 241 N.J.Super. 353, 358, 575 A.2d 35 (App.Div.1990)).
A court may enter an order "that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" *1138 R. 4:10-3. The court may order that the discovery be had only on specified terms and conditions, that it be had by a method other than the one demanded by the party seeking discovery, that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters. R. 4:10-3(b), (c), and (d). A lower court's discovery rulings should not be reversed on appeal absent an abuse of discretion or a mistaken understanding of the applicable law. Payton v. N.J. Tpk. Auth., 148 N.J. 524, 559, 691 A.2d 321 (1997).
In the context of a defendant's request for police personnel records in a criminal prosecution, where a defendant's constitutional right of confrontation is at stake, it has been held that an in camera inspection of the records should be conducted "where a defendant advances some factual predicate making it reasonably likely that information in the file could affect the officer's credibility." State v. Harris, 316 N.J.Super. 384, 387, 720 A.2d 425 (App.Div.1998). The defendant must establish that the file may reveal prior bad acts that bear "peculiar relevance" to the issues at trial. Id. at 398, 720 A.2d 425. This preliminary requirement recognizes the "significant public interest in maintaining the confidentiality of police personnel records." State v. Kaszubinski, 177 N.J.Super. 136, 138, 425 A.2d 711 (Law Div.1980).
In asserting that he was entitled to personally review the personnel file and IA file of each individual defendant-officer, plaintiff contends that such files were relevant to the issue of the Township's liability under section 1983. It is true that, with respect to municipal liability, "it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future." Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990). Thus, the existence of deficient procedures for discovering officer misconduct may prevent a police chief from learning of an officer's past violent behavior and hence his dangerous propensities. Ibid. (citing Brandon v. Holt, 469 U.S. 464, 467, 105 S.Ct. 873, 875, 83 L.Ed.2d 878, 882 (1985)). This, in turn, could create the causal nexus between the city's unlawful policy and the plaintiff's injuries. Ibid.
Here, however, the court undertook an in camera review of all of the files and documents requested by plaintiff. The court concluded that nothing in the materials reviewed was relevant to plaintiff's claims against the Township because no officer had been accused of anything akin to a false arrest or a violation of a plaintiff's civil rights. In addition, the court found nothing in any officer's psychological file that would have supported a claim that any officer was unfit for duty or that the municipality failed to act in response to such unfitness.
Although plaintiff asserts on appeal that even a demeanor complaint against an officer might be relevant to whether he conducted a careless or slipshod investigation, we do not agree. We also note that this case was not about any officer acting violently towards plaintiff or abusing the authority of his office. Rather, the Township's liability was premised on its apparent failure to have adequately trained its staff with respect to showup procedures. No individual defendant was alleged to have mishandled or mistreated plaintiff in any fashion. As such, and because the lower court did review in camera all of the documents requested by plaintiff, we find no abuse of discretion.
Affirmed.
NOTES
[1] Officer Koster's name is misspelled as "Koester" in the notice of appeal.
[2] Officer Dilginis's name is misspelled as "Dilgines" in the notice of appeal.
[3] Detective Ronan was not listed as an individual defendant on the notice of appeal, nor is he listed as a respondent on the cover of plaintiff's brief, but he is one of the defendant police officers in whose favor the lower court granted summary judgment. In the interest of finality, we treat Detective Ronan as a respondent for the purposes of this appeal.
[4] Captain Shapiro, one of the individual defendants in the proceeding below, was not listed as a defendant on the notice of appeal. All the briefs submitted in pursuit of this appeal list him as a defendant, however, including a brief submitted on his behalf. In the interest of finality, we treat Captain Shapiro as a respondent for the purposes of this appeal.
[5] We are using first initials to distinguish the two officers/defendants whose last names are Donnelly.
[6] As of May 2007, the actual robber had not been apprehended, and the investigation was still open.
[7] It was represented to the court that all other defendants had "settled out," but the orders of dismissal are not in the record.
[8] We need not consider the implications, if any, that might pertain here arising from the Special Master's recently-issued report to the Supreme Court in Henderson, as it would be premature to do so pending the Court's review of that report.