720 A.2d 425 (1998)
316 N.J. Super. 384
STATE of New Jersey, Plaintiff-Respondent,
v.
Kareem HARRIS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 1998.
Decided November 24, 1998.
*426 Steven M. Gilson, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Gilson, Designated Counsel, of counsel and on the brief).
Gary A. Thomas, Assistant Prosecutor, for plaintiff-respondent (Patricia H. Hurt, Essex County Prosecutor, attorney; Mr. Thomas, of counsel and on the brief).
Before Judges KING, WALLACE and NEWMAN.
The opinion of the court was delivered by NEWMAN, J.A.D.
This appeal raises the issue of whether police personnel records should be disclosed for an inspection to determine whether the file contains evidence material to the defense consistent with a defendant's
right of confrontation. We hold that the right of confrontation requires disclosure where a defendant advances some factual predicate making it reasonably likely that information in the file could affect the officer's credibility. The disclosure here should be made to both the defense and the State in chambers and on the record.

I.
On August 13, 1996, the Essex County Grand Jury indicted defendant Kareem Harris on eighteen-counts: second degree conspiracy to commit robbery and aggravated assault, contrary to N.J.S.A. 2C:5-2, N.J.S.A. 2C:15-1, and N.J.S.A. 2C:12-1b (Count One); three counts of first degree robbery, contrary to N.J.S.A. 2C:15-1 (Counts Two through Four); three counts of second degree aggravated assault, contrary to N.J.S.A. 2C:12-1b(1) (Counts Five through Seven); three counts of first degree kidnapping, contrary to N.J.S.A. 2C:13-1b(1) (Counts Eight through Ten); first degree attempted murder, contrary to N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5-1 (Count Eleven); third degree unlawful possession of a weapon (handgun), contrary to N.J.S.A. 2C:39-5b (Count Twelve); second degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-4 (Count Thirteen); second degree aggravated assault, contrary to N.J.S.A. 2C:12-1b(1) (Count Fourteen); two counts of third degree aggravated assault, contrary to N.J.S.A. 2C:12-1b(5)(a) (Counts Fifteen and Sixteen); second degree eluding police, contrary to N.J.S.A. 2C:29-2b (Count Seventeen); and fourth degree resisting arrest, contrary to N.J.S.A. 2C:29-2 (Count Eighteen).
Defendant was found not guilty of the first thirteen counts of the indictment, all of which involved a robbery occurring on January 6, 1996. Defendant was found guilty of Counts Fourteen through Eighteen, all of which concerned a police pursuit of defendant resulting from a telephone call to police headquarters by the victim of the January 6, 1996 robbery accusing defendant as being the perpetrator.
On March 26, 1997, the trial judge sentenced defendant to nine years' incarceration on the second degree aggravated assault of *427 Detective Mario Simmons (Count Fourteen); concurrent five-year terms on the third degree aggravated assaults of Detectives Simmons and Robin Robinson (Counts Fifteen and Sixteen); and a consecutive eight-year term for eluding the police (Count Seventeen). The trial judge merged the resisting arrest conviction (Count Eighteen) with the aggravated assault conviction (Count Fourteen). The usual fines and fees were imposed. Defendant appealed.
On March 5, 1998, defendant filed a motion to unseal the trial court's March 7, 1997 interview with Captain Archibald J. Davison, the Captain in charge of Internal Affairs at the Newark Police Department, regarding the suspension of Detective Mario Simmons, the arresting officer and the key witness in this case. On April 30, 1998, this court ordered the following:
The Panel has examined the "sealed" portion of the transcript of the trial on March 7, 1997, specifically the in camera testimony of Captain Archibald Davidson, in charge of the Office of Internal Affairs of the Newark Police Department. The Panel is unable to determine from the sealed portion of the transcript if disclosure is required in the circumstance for compliance with the Confrontation Clause. Without consideration of the full record and the legal arguments on the plenary appeal, the Panel is without a context in which to make this important determination.
The Panel therefore reserves decision on this motion, ..., and the Clerk is directed to list the case for oral argument in Trenton before Part B upon perfection on a date when Judge King is sitting. Upon that plenary submission, the court will then rule on this motion.
Having now considered the motion in plenary fashion, we grant the relief requested and remand for further proceedings to be concluded within sixty days of the date of this opinion.

II.
The relevant facts of the incidents of January 6, 1996 and January 19, 1996 may be summarized as follows. On January 6, 1996, at approximately 11:00 a.m., Tom Austin, Arthur Hicks and Lloyd Glover were in Austin's Auto Body Shop at 381 Jeliff Avenue in Newark, New Jersey watching television. Austin noticed a BMW pull up outside the shop. Although he did not recognize the automobile, Austin assumed that it belonged to one of his customers. Two men wearing ski masks exited the car. As they entered the shop, one of the men, pointing a gun to Austin's face, stated "Austin, I got to have a thousand." Austin responded that he did not have any money. Unhappy with this response, one of the intruders threw Austin to the floor, handcuffed him behind his back, and taped his mouth and eyes shut. After demanding $1,000 from Austin, but only receiving $100, one of the intruders shot Austin grazing his head causing him to bleed profusely.
Before leaving, the intruders again demanded more money from Austin. When Austin reiterated that he did not have any more money, the gunman shot Austin in the leg. As the intruders left the shop, the gunman warned Austin, "[t]he next time I bring my car to you, you better have it ready on time." The intruders took $100 from Austin, approximately $400 and a ring from Hicks, and $1,245 from Glover.
Austin was hospitalized for about seven days. Although he could not provide a physical description of the two intruders because they had worn masks, he told the police during his hospital stay that he had heard the gunman's voice "many times before" but could not place it.
Subsequently, on January 19, 1996, Austin was in his shop when defendant, one of Austin's customers, entered and requested an estimate on his damaged car, an Acura Legend, which had been repaired by the shop. On prior occasions, defendant had brought in a Lexus for repairs. Austin recognized the customer's voice as being the gunman who shot him. Austin told his daughter to record the license plate number of the customer's car and to contact the police. She did so, but by the time the police arrived, defendant had left the shop in the Acura.
Detectives Mario Simmons and Robin Robinson of the Newark Police Department *428 responded to the call. After the detectives were provided with a description of defendant's car, the detectives, attired in plain clothes and driving an unmarked vehicle, observed a car matching the description and license plate number in the vicinity of Austin's Body Shop soon after the defendant had departed. The detectives pulled directly behind the car and activated their vehicle lights and drew their guns. Simmons approached the driver's side and Robinson approached the passenger's side of the car.
Detective Simmons immediately recognized and knew the defendant by name. Simmons first met defendant in 1991 when Simmons assisted defendant who was then a robbery victim. Simmons testified that between 1991 and 1995 he had seen defendant "in his travels." Simmons testified that his next contact with defendant was in 1995 when he arrested defendant for producing a false driver's license during a motor vehicle stop and consequential detention pursuant to a warrant that had been issued for a different person, Kareem Harrison.
While approaching defendant's automobile, Simmons instructed defendant to turn off the ignition and to step out of the car. Defendant refused to do so, exclaiming that all of his matters had been resolved. After Simmons again demanded that defendant exit the car, defendant complied but did not turn off the ignition. While Simmons was conducting a pat-down safety search of defendant, Simmons testified that defendant "took his arm and knocked [him] back and [he] stumbled back and [defendant] jumped back into the car." Informing defendant that he was under arrest for assault, Simmons jumped into the car with defendant and a struggle ensued. While Simmons' legs were dangling from the car, defendant moved the car forward.
As Simmons and defendant struggled for control of the steering wheel, gear, and ignition, Detective Robinson leaned into the car, attempting to assist her partner. The car hit a truck in the roadway, causing Robinson to be thrown from the car and onto the ground. As a result of her falling to the ground, Robinson sustained a sprained wrist and bruises to her legs. She returned to the police vehicle and called for backup before rejoining Simmons and defendant. Robinson attempted to subdue defendant by hitting him in the head with her walkie-talkie, before again falling from the car onto the ground when the car backed into something.
Meanwhile, Simmons and defendant continued to struggle. Simmons testified that he felt defendant's hand on his waist, where he had reholstered his gun prior to conducting the pat-down. As a result, Simmons removed the gun. According to Simmons, at the same time, defendant tried to pull the gun away from him. Simmons testified that:
I pulled the gun out and he had his hand on the gun and on my hands, and I was trying to pull it away from him. And when I managed to pull it away from him I was going to shoot him because I felt my life was in danger. He was trying to hurt me with the car. I went to shoot him, he hit my arm and made me shoot myself.
Simmons, pointing his gun at defendant's head, then attempted to squeeze the trigger again, but the gun malfunctioned because the shell casing from the initial discharge had lodged in the top of the gun. Subsequently, Simmons realized that he had been shot and exited the car. Defendant fled in the car.
Two persons working in the area saw the confrontation and testified at trial. They, of course, knew nothing of the prior relationship between Detective Simmons and defendant.
Defendant's version of the incident was markedly different. Defendant denied having been to Austin's Auto Body Shop on January 6, 1996. Prior to January 6, 1996, defendant had visited Austin's shop on two occasions to obtain repair estimates. On both occasions he spoke to Austin.
Defendant also testified concerning his prior relations with Detective Simmons. Between 1991 and 1995, defendant saw Detective Simmons twice in the South District of Newark. According to defendant, on these occasions, Simmons took money from defendant and his friends, and either planted drugs on them or harassed them. With respect to defendant's allegations that Simmons had planted drugs on defendant's *429 friend, defendant testified that on one occasion Simmons had searched defendant and his friend, Raheem, on a street in front of Raheem's house. Simmons initially searched them finding no drugs. However, after Simmons had ordered defendant and Raheem to sit in the police car, Simmons found drugs and charged Raheem with possession. Defendant was never arrested for drugs by Detective Simmons.
In January 1995, Detective Simmons arrested defendant for falsifying his identity. On this occasion, Simmons took defendant to police headquarters and asked defendant for his real name to which defendant replied, Kareem Harris. After defendant provided Simmons with his real name, Simmons consulted a computer and told defendant that Kareem Harris was not his real name. Apparently, the officer connected defendant with Kareem Harrison, a man against whom an arrest warrant had been issued, and told defendant that he was going back to prison. Defendant repeatedly told Simmons that he was not Kareem Harrison. Defendant further testified that, while he was being wrongfully detained, he became frightened of going to jail for something he did not do, and, as a result, he jumped out of the window at the police station.
Defendant also testified regarding the January 19, 1996 incident. Defendant recounted that, after Simmons had approached his car, the detective immediately placed a gun to his head, removed him from the car, and slammed him against the car. As Simmons proceeded to conduct a pat-down, defendant asked him "what is the problem now." Simmons responded "don't worry about a problem, I will find a problem for you for your fing, I will find a f-ing problem for you." Simmons continued "I will find a f-ing problem for your ass."
According to defendant, he then slid back into his car without using any force because he was afraid that Simmons was going to kill him and he thought Simmons was "up to his harassing game." Simmons responded by jumping onto defendant's lap and attempting to pull him from the car. A struggle ensued for the gear shift, with Simmons "on top of [defendant], roughing [him] up," and Robinson hitting defendant in the head with her walkie-talkie.
Defendant denied ever reaching for Simmons' gun or having his hand around Simmons' waist. Further, according to defendant, when Robinson left the vehicle to call for backup, Simmons threatened "I am sick of you, I am going to kill you," and pulled out his gun, pointing it at defendant's head. The gun then went off and defendant's arm began bleeding. After Simmons departed, defendant "scared for [his] life" drove away in the car. Defendant had a relative drive him to Harlem Hospital in New York, where he was treated after using a fictitious name because he feared that Simmons would bring false charges against him. Defendant remained in New York, failing to return to New Jersey, until his arrest in May, 1996.

III.
During trial, defense counsel made two requests for records to impeach Detective Simmons' credibility. The first request was for Detective Simmons' medical records from his January 19, 1996 hospital stay. According to defendant, Detective Simmons is a narcotics abuser, and defense counsel sought to review these medical records to determine whether Simmons was intoxicated at the time of the incident. Defense counsel's second request resulted from Detective Simmons' suspension from the police force, which occurred on March 6, 1997,[1] the day after Simmons completed his testimony, and a newspaper article reported that the Newark Police Department was conducting an investigation regarding Newark police officers and shake downs of people who were suspected of being narcotic dealers. Defendant also claimed that Detective Simmons has been "shaking" him down. Defense counsel requested that Simmons' police personnel file be inspected in camera by the court to determine whether the reasons for his suspension *430 may be used by the defense to impeach Simmons' testimony.
At a N.J.R.E. 102 hearing regarding the admissibility of evidence that defense counsel sought to use during the cross examination of Detective Simmons concerning Simmons' previous relations with defendant, defense counsel's final question to the detective was "[h]ave you ever ... shook [defendant] down?" After Simmons responded no, counsel stated:
Your Honor, I have to put something on the record. My client has insisted that Detective Simmons is a drug user who [has] shaken him down. One of the reasons that I have been asking the prosecutor for Detective Simmons' medical reports is because I wanted to see if there was anything in the medicals from when he was transported to the hospital on [January 19, 1996] ... because [there] is an allegation that I feel very uncomfortable making on a police officer or anybody else under any circumstances. My client is really insisting that I pursue this issue. Like I said, I initially, I thought that normally in the normal course of business whenever you [have] a witness who is injured, the State usually suppl[ies] the medical reports. In this case, I [have] medical reports from... Mr. Austin but none for Detective Simmons. Yesterday my investigator went to the hospital, those reports will be available from what I understand at 12 o'clock this afternoon. I feel uncomfortable because right now I don't believe that I have a basis other than [t]hat my client is telling me to pursue that line of questioning.
After an in camera review of Detective Simmons' medical records, the court concluded that there were "[n]o indications plus or minus for use of drugs."
Subsequently, on March 6, 1997, Detective Simmons' testimony was concluded and he sustained an apparent heart attack outside the courtroom. On that same day, the prosecutor informed the defense that Simmons had been suspended from the police force. Further, on that same day, the Star Ledger newspaper reported that the Newark Police Department was conducting an investigation regarding police officers and shake downs of people who were suspected of being narcotics dealers. As a result, defendant requested an in camera review of Detective Simmons' personnel files and the reason for his suspension, stating that:
The Court review those records and then make a determination to what it feels I may be entitled to, that could impute knowledge on, one, either the credibility of Detective Simmons or something that may assist me in the cross examination of Detective Simmons if I were to ask that my cross examination be reopened ....
Defense counsel further noted that:
My client has been maintaining basically since we have been involved with this case a couple of things. Number one, that Detective Simmons has been shaking him down. Number two, that Detective Simmons was a narcotics abuser.... Now two things. Yesterday, [there] was also a[n] article in the newspaper that there was an investigation going on in Essex County by the Newark Police Department regarding police officers and shake downs of people who were suspected of being narcotics dealers. I don't know whether or [if] that was why Detective Simmons was suspended.
The court denied defendant's motion for an examination of Detective Simmons' personnel file, concluding that defendant had not shown a "factual predicate that it is reasonably likely that an examination of his personnel file as opposed to the reason for the suspension contains relevant evidence or relevant information." In response to the newspaper article, the trial court noted that the article reported that the investigation dealt with the North Station, as opposed to the South Station where Detective Simmons was assigned. Thus, according to the court, there did not appear to be a connection between the allegations of possible shake downs in the North Precincts and Detective Simmons.
Despite the trial court's refusal to examine Detective Simmons' personnel file, it did order that a police department supervisor appear for an in camera interview to inform *431 the court of the reason for Simmons' suspension. Captain Archibald J. Davison, the Captain in charge of Internal Affairs at the Newark Police Department, was interviewed on that same day, March 7, 1997. The interview was conducted in camera with the court sealing the portion of the transcript relating to the interview. The sealed portions of the transcript provides, in its entirety, the following:
The Court: Captain, it is my understanding that Detective Simmons was suspended on March 6?
Witness: Yes, that is correct.
The Court: Why?
Witness: On March 5th a citizen came into Internal Affairs and had stated that he lives in the proximity of Detective Simmons. He said on numerous occasions he had went and purchased drugs for Detective Simmons, specifically crack cocaine. He said, I am not perfectly sure on the days of the weeks that it was involved but he said on the last occasion he was given $40.00 to go buy Detective Simmons, to go and purchase drugs for him. He couldn't find a drug dealer and spent the $40.00. He never went back with the drugs that night. The next day or sometime thereafter, he was standing on Bergen Street talking to someone that he had acquaintance with and Detective Simmons pulled up in his car and told the other person to leave the area and physically threatened him as to why he never came back with the drugs, why he never got the money back and told him, you know, I can cause you a lot of harm. So the guy tried to explain to him, he was on vacation and he was going to get his vacation check that day and he would pay him back the $40.00 or buy drugs. He now is worried that Detective Simmons was going to do either physical harm to him, arrange to have him, possibly, drugs put on his possession and have him arrested for he had the type of employment where if he get any involved in any serious criminal allegations or charged with it he would be suspended [or] terminated from his job. He said that is why he came into Internal Affairs to ask us if we could just speak to Detective Simmons to not bother him.
Based on that we were going to bring Detective Simmons. We responded to his police station. We were going to bring him in Internal Affairs and have a urine test done on him for drugs. He wasn't at his precinct. They said he was over here in Court. We didn't know what case he was on. The guys calling from here, he said he is in Court, when the guy is over for the Court I will talk to the prosecutor when it is over we will bring him down from there. On the arrival to police headquarters he fell down with a heart attack or make believe heart attack. He was transported to Beth Israel Hospital. Two detectives accompanied him there. After a couple hours there the tests were done. They revealed no heart attack at that time. When they asked him to give a sample he had a second heart attack or chest pains. They said to stay there and wait and eventually he did give them two very small samples. The samples were not taken in accordance with Attorney General guidelines where observation has to be made when you place the urine in the bottles. It was done under a sheet. So the officers were sent back to the hospital [and] requested a second sample. He refused to give the second sample which led us to believe that there was, possibly, was contamination with the first one. As a result of his refusal ... an automatic suspension is imposed by the Newark Police Department. We consulted the prosecutor before we did ... the suspension to make sure that it wasn't just our belief that if the first sample is tainted, that the second sample won't be considered by the Attorney General guidelines. And he led us to believe that the second sample would become the first once the Attorney General guidelines were met. Being he refused it, that is why he was suspended.
The Court: Thank you.
After the trial judge met with Captain Davison, the judge determined that the reason for Detective Simmons' suspension was for the violation of Newark Police Department rules. He also noted that there was no *432 proof that Simmons was taking drugs, nor was there proof of shakedowns. Further, in sealing the interview with Captain Davison, the court stated:
If we get to that point, if there is a conviction and there is an appeal I would assume the Appellate Division may want to view it. But other than that I am not going to disclose the reason for the suspension. I think that the privacy right of the officer given the reason far outweigh any probative value.

IV.
On appeal, defendant argues that the trial court erred by not conducting an in camera inspection of Simmons' personnel file. Defendant contends that the matter must be remanded for an in camera review of the personnel file to determine whether impeachable information was withheld from the defense and, if so, to provide the information to defendant pursuant to his constitutional right of confrontation.
The Sixth Amendment to the United States Constitution and Article 1, Section 10 of the New Jersey Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974); State v. Maben, 132 N.J. 487, 496, 626 A.2d 63 (1993). The essential purpose of confrontation is to secure for the defendant the opportunity of cross-examination. Davis, supra, 415 U.S. at 315, 94 S.Ct. at 1110, 39 L.Ed.2d at 353. Cross-examination is the principal means by which a witness' credibility is tested. Ibid. A witnesses' credibility may be attacked by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate to issues in the case at bar. Ibid.
The Confrontation Clause does not require disclosure of any and all information that might be useful in contradicting unfavorable testimony. The determination of whether police personnel records should be disclosed involves a balancing between the public interest in maintaining the confidentiality of police personnel records and a defendant's guarantee of cross-examination under the Confrontation Clause. State v. Kaszubinski, 177 N.J.Super. 136, 139, 425 A.2d 711 (Law Div. 1980). In balancing these considerations, the party seeking an in camera inspection must advance "some factual predicate which would make it reasonably likely that the file will bear such fruit and that the quest for its contents is not merely a desperate grasping at a straw." Id. at 141 (citations omitted). It is generally not necessary for a defendant to establish that the personnel file actually contains relevant information so long as the proper factual predicate has been met. Ibid.
Courts have permitted the disclosure of police personnel records where they may reveal prior bad acts that bear "peculiar relevance" to the issues at trial. In cases involving assault on a police officer, courts have concluded that allegations concerning the officer's use of excessive force in making an arrest is relevant to the assault issue. Further, courts generally allow either direct or in camera inspection of police personnel records when the defense claims the officer was the aggressor and the court finds that parts of the officer's personnel history may be relevant to the officer's credibility or to the defendant's claim of self-defense. See, e.g., State v. Pohl, 89 N.M. 523, 554 P.2d 984, 985 (N.M.Ct.App.1976) (finding that the trial court erred in not conducting an in camera inspection to determine whether files contained evidence material to the defense where defendant has shown two prior instances of the officer's alleged misconduct); Pitchess v. Superior Court of L.A. County, 11 Cal.3d 531, 113 Cal.Rptr. 897, 522 P.2d 305, 309 (Cal.Sup.Ct.1974) (permitting disclosure of police officer's disciplinary records where defendant, charged with battery against officer, demonstrated that officer had previously been accused of misconduct); State v. Fleischman, 10 Or.App. 22, 495 P.2d 277, 282 (Or.Ct.App.1972) (finding that police personnel files indicating officer's possible over-aggressiveness should have been made available to defendant, who was convicted of assault, prior to cross-examining the ex-officer).
*433 Conversely, courts have refused to permit an in camera inspection of an officer's personnel file where the defendant failed to make a showing that the file contained material information. See, e.g., State v. Parker, 886 S.W.2d 908, 917 (Mo.1994) (refusing disclosure of police personnel file where defendant made no showing concerning the materiality or exculpatory nature of the file's contents), cert. denied sub nom Parker v. Missouri, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995); Cargill v. State, 255 Ga. 616, 340 S.E.2d 891, 911 (Ga.1986) (concluding belief that police officers testifying would give perjured testimony, where defense counsel articulated no basis for such belief, was insufficient to permit disclosure of officers' personnel files).
Here, conflicting trial testimony was presented as to who initiated the altercation between defendant and Detective Simmons and why defendant fled from the police. Both of these evidentiary disputes speak to the trial issues of assault and eluding the police, crimes for which the defendant was ultimately convicted.
Defendant has more than shouldered his burden of advancing some factual predicate that would make it reasonably likely that the information in the file could affect the detectives' credibility; namely, the detective's suspension, in conjunction with the police department's investigation of shakedowns by narcotics' officers, and defendant's accusations that the detective is a drug user, has planted drugs on his friend, and has shaken defendant down in the past. Courts have permitted the in camera inspection of a police officer's personnel file based upon mere allegations of the officer's improper conduct. See, e.g., Pohl, Pitchess, and Fleischman, supra. We have far more here. Defendant's allegations concerning Detective Simmons' wrongful conduct have been, at least in part, substantiated by Detective Davison's testimony, who, in explaining the reasons for Simmons' suspension, referred to Detective Simmons' refusal to submit a urine specimen and the allegations of shake down and drug use by the Detective made to internal affairs. Indeed, this very information itself would have been of great value to defense counsel who presumably would have pursued it further in seeking to reopen Simmons' cross-examination. Under these circumstances, we are convinced that the trial court was mistaken.
Because of the unusual circumstances presented, especially in view of Detective Simmons' then suspension for failure to submit a urine specimen, the examination of Simmons' personnel file should be conducted in chambers in both counsel's presence on the record and with both counsel being afforded the right to inspect the file. Furthermore, in view of Detective Simmons' termination of his police employment, there may be other relevant proceedings for which defense counsel may request access. Detective Simmons' conduct set the entire episode into motion which ultimately led to the criminal charges for which defendant is serving a seventeen-year prison sentence. The important principle is that defendant's right of confrontation by fully challenging Detective Simmons' credibility should not be compromised.
We remand for further proceedings before the trial judge. We do not rule out the need for a plenary hearing because we are uncertain of what will be disclosed by the materials to be inspected. We anticipate defendant will move for a new trial based on evidence that was not made available to him before the trial concluded and evidence uncovered since the trial ended. We direct that the trial judge act on any such application within sixty days of this opinion. If such application is denied, defendant can renew this appeal and request our expedited consideration by immediately notifying the Presiding Judge of Part B. If the application is granted, we relinquish jurisdiction and direct a prompt retrial. In view of our present disposition, we have not addressed the remaining issues raised by defendant relating to the sufficiency of the evidence to sustain the eluding conviction and the excessiveness of the sentence.
Remanded for further proceedings consistent with this opinion.
NOTES
[1] We were advised by the Assistant Prosecutor who argued the appeal that Detective Simmons was fired on October 1, 1998.