NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5602-14T3

BRANDON CAMACHO,
by his Guardian Ad
Litem, BEN CAMACHO,
and BEN CAMACHO,
individually,

 Plaintiffs-Appellants,

v.

RIAZ MOTANI, JOSEPH
MARKULIC and HOWELL
TOWNSHIP,

 Defendants-Respondents.

___________________________________

 Argued January 18, 2017 – Decided September 25, 2017

 Before Judges Espinosa, Suter and Guadagno.

 On appeal from the Superior Court of New
 Jersey, Law Division, Monmouth County, Docket
 No. L-5544—11.

 Matthew G. Bonanno argued the cause for
 appellants (Rebenack, Aronow & Mascolo, LLP,
 attorneys; Mr. Bonanno, on the briefs).

 Jared J. Monaco argued the cause for
 respondents (Gilmore & Monahan, PA, attorneys;
 Mr. Monaco, on the brief).

PER CURIAM
 Plaintiff Brandon Camacho,1 a seventeen-year-old pedestrian,

was struck by an automobile driven by R.W. and seriously injured.

Defendant Riaz Motani, an officer with the Howell Township Police

Department (HTPD), issued a summons to Brandon for jaywalking,

N.J.S.A. 39:4-34, that was subsequently dismissed before trial.

Plaintiffs then filed the instant action against defendants

Motani; his supervisor, Joseph Markulic; and Howell Township,

alleging various causes of action including malicious prosecution,

malicious use of process, supervisor liability (against Markulic)

and a violation of the New Jersey Civil Rights Act (CRA), N.J.S.A.

10:6-1 to -2.2 He appeals from the dismissal of his complaint.

For the following reasons, we affirm.

 I.

 In determining whether a summary judgment motion was properly

granted, we review the evidence, drawing "all legitimate

inferences from the facts in favor of the non-moving party." Globe

1
 This action was brought by Brandon Camacho's guardian ad litem,
Ben Camacho, on behalf of Brandon and on his own behalf
(collectively, plaintiffs). To avoid confusion when referring to
them individually, we refer to them by their first names and intend
no disrespect.
2
 The complaint also alleged claims of negligence, invasion of
privacy, a violation of 42 U.S.C.A. § 1983 and a demand for
punitive damages. Counsel confirmed at oral argument that these
claims have been abandoned.

 2 A-5602-14T3
Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016) (citing R. 4:46-

2(c)).

 At approximately 6:19 p.m. on January 20, 2010, R.W. was

driving in Howell Township on Newtons Corner Road when he struck

Brandon. The section of the road where the accident occurred was

unlit, extremely dark and did not have a crosswalk.

 At his deposition, R.W. stated he "was heading south on

Newtons Corner Road," on his way home. Newtons Corner Road is a

one-lane road and he was completely within the southbound lane.

He "never saw Brandon. . . . There was the impact and [he] hit

the brakes." He first saw Brandon as he came across the hood of

his car, from the passenger side of the front hood up to the

windshield. He pulled his car to the side of the road and got out

of the car. He saw Brandon lying in the street. R.W. stated

Brandon was dressed all in black – jacket, jeans, sneakers and a

baseball cap. Trying to provide a reason why he did not see

Brandon before the accident, R.W. stated how dark it was there and

referred to the fact Brandon's clothing was so dark.

 Motani was the second officer to arrive at the crash scene.

Because he was senior to the other officer, he took control of the

investigation. Motani interviewed R.W., who reported that "an

image just appeared in front of his car." He repeatedly stated,

"this kid came out of nowhere," "he never saw him while he was

 3 A-5602-14T3
driving down Newto[ns] Corner Road, and after hitting him, R.W.

"immediately stopped his vehicle where it was located." At

Motani's request, R.W. agreed to be transported to a hospital for

a medical evaluation and toxicology screening.

 The Monmouth County Serious Collision Analysis Response Team

(SCART) arrived at the scene at approximately 8:00 p.m. SCART's

report states:

 The following team members responded:
 Sergeants Todd Gregory and John Green, Ocean
 Township PD; and Patrolman John T. Fay,
 Eatontown PD.

 Patrolman Fay handled the administrative
 responsibilities and photographed the crash
 scene, while Sergeants Gregory and Green
 measured the crash scene using the LTI Impulse
 200 laser. Sergeant Green will complete the
 scene diagram, which will be used by Howell
 Police in their investigation.

 One of the diagrams prepared by SCART depicts the impact

point in the southbound travel lane. The diagrams also depict a

white sock and a black sneaker in the southbound lane's shoulder,

approximately thirty-five to forty-two feet from Brandon's post-

impact position. A second black sneaker was located in the

northbound lane, approximately ten feet north of Brandon's post-

impact position.

 4 A-5602-14T3
 Based upon the information he had gathered at the time, Motani

told SCART he believed Brandon was "[c]rossing the northbound lane

to the southbound lane when he was struck . . . ."

 R.W. was released from Jersey Shore Medical Center later that

evening and reported to the Howell Township Police Department,

where Motani interviewed him again. In his videotaped statement,

R.W. repeatedly stated he did not see Brandon prior to the impact.

At one point, Motani asked, "Can you definitively tell me what

direction the pedestrian was walking from? Was he walking from

the right or from the left?" R.W. replied he assumed Brandon was

"running" across the street from the left to the right. In his

report following this interview, Motani stated,

 At impact Mr. R.W. remembers seeing a dark
 object (possibly a jacket with fur) roll up
 over the windshield, as all the glass
 shattered. The guy that got hit just rolled
 up, over the car, and onto the street he
 believes. He stated it appeared that the guy
 must've been walking from his left to right.

 Motani reviewed video footage of the collision taken from a

security camera at the nearby Sovereign Bank and noted the

following at 18:18:29-30: "Pedestrian image was slightly distorted

due to the distance from the surveillance camera and the fact that

the immediate area of the crash was not illuminated. Pedestrian

appears to be approximately 2 ft east of the solid white fog line,

in the [southbound] lane of Newtons Corner Road . . . ."

 5 A-5602-14T3
 At his deposition, Motani conceded the only thing he saw on

the video that supported his conclusion that Brandon was crossing

the street was a frame on the fourth disc of the surveillance

video labeled at 18:18:29-30. The photograph taken of this frame

is dark and, viewing the evidence favorably to plaintiffs, Brandon

is not visible.

 The hospital treating Brandon reported to Motani that Brandon

had sustained serious injuries to the right side of his body:

broken right humerus, broken right tibula and fibula injuries,

right side broken collarbone, possible broken right hip, swelling

and laceration over right eye, and head lacerations on right side.

Motani used this information to establish the direction Brandon

had been facing but acknowledged it did not establish whether

Brandon was moving in the moments before impact.

 On February 11, 2010, Motani called Ben at his house to obtain

a medical update on Brandon. He said Ben was "extremely arrogant

and belligerent" and terminated the call after advising Motani "to

contact his attorney." Motani testified he had explained to Ben

that he believed Brandon had been crossing the roadway outside a

crosswalk when he was struck.

 6 A-5602-14T3
 On February 12, 2010, Motani concluded his investigation and

issued Brandon a summons for violating N.J.S.A. 39:4-34.3 He

described the "stepping stones" toward formulating his opinion as

to who was at fault: eyewitness statements, the "specific

measurements from the SCART team" to make "the best estimation of

where the pedestrian was in the roadway at the time of the crash,"

efforts to speak to persons Brandon was with prior to the accident

and the bank surveillance video, in which he saw "certain images

of the depiction of the crash." He said he made the determination

to issue the summons after speaking to the prosecutor's office.

Although he believed N.J.S.A. 39:4-34 fit the circumstances, after

discussing the matter with the prosecutor's office, Motani

compared that statute with N.J.S.A. 39:4-36(a)(2), which provides,

"No pedestrian shall leave a curb or other place of safety and

walk or run into the path of a vehicle which is so close that it

3
 N.J.S.A. 39:4-34 provides:

 Where traffic is not controlled and directed
 either by a police officer or a traffic
 control signal, pedestrians shall cross the
 roadway within a crosswalk or, in the absence
 of a crosswalk, and where not otherwise
 prohibited, at right angles to the
 roadway. . . . On all highways where there
 are no sidewalks or paths provided for
 pedestrian use, pedestrians shall, when
 practicable, walk only on the extreme left
 side of the roadway or its shoulder facing
 approaching traffic.

 7 A-5602-14T3
is impossible for the driver to yield or stop." He determined the

latter violation was more appropriate. The charge was amended to

a violation of N.J.S.A. 39:4-36(a)(2), and subsequently dismissed.

 Defendant Sergeant Joseph Markulic of the HTPD played only a

supervisory role in the investigation. He reviews reports from

the officers he supervises to ensure they are complete and accurate

and that probable cause has been established; he reviewed and

signed off on Motani's report. Markulic concluded there was

probable cause for the complaint because Brandon crossed the road,

and failed to yield to the motor vehicle in the lane of travel.

He did not recall all the materials he relied upon to reach that

conclusion but noted it was supported by the driver's statement,

the SCART diagram and the review of the surveillance video.

Markulic did not review the surveillance video himself.

 On February 16, 2010, Ben filed a complaint against R.W.

alleging he violated N.J.S.A. 39:4-97 (careless driving) because

he "[s]truck ped[e]strian during driving carelessly above speed

limit."

 The Monmouth County Prosecutor's Office prepared a

memorandum, dated July 23, 2010, regarding "Assault By Auto – Case

#HM10-034, Victim: Brandon Camacho." The memorandum concluded

Brandon's actions, which included "improperly entering and

attempting to cross Newtons Corner Road while wearing dark

 8 A-5602-14T3
clothing" were "the proximate causes of the collision which

resulted in his serious injuries." The memorandum recommended

that the case be closed. On May 3, 2011, the complaints against

Brandon and R.W. were both voluntarily dismissed. At the municipal

court dismissal hearing, the State's attorney noted for the record

that R.W. "has admitted that he doesn't know what happened. That

he feels like Mr. Camacho came out of nowhere. So, he would be

the worst witness possible for the State to proceed accordingly."4

 Before the accident, R.W. knew two members of the HTPD.

Sergeant David Flaherty had lived in the house next to R.W.'s

since 1996, but R.W. characterized their relationship only as

"neighborly" and asserted they "are not close." Corporal Fred

Bauer, has a young daughter who had socialized with R.W.'s daughter

since 2008. R.W. characterized his relationship with Bauer as

"casual."

 Motani testified he met Flaherty when he started working with

the HTPD in 1997. He had occasionally seen him outside work at a

"police-related function." Motani has known Bauer since joining

the HTPD and considers him a friend. Markulic knew both Flaherty

and Bauer, but he did not socialize with either.

4
 After the ticket to Brandon was issued, R.W. contacted Motani
and asked that the ticket be dismissed because the "Camacho family
has enough to deal with."

 9 A-5602-14T3
 Ben sought compensation for Brandon's injuries from R.W.'s

automobile insurer, New Jersey Manufacturers Insurance Company

(NJM). Based on NJM's liability determination, it refused to

offer any money and the case proceeded to litigation. NJM took

its "no-pay" position partially in reliance on Motani's report

documenting that his investigation concluded with a determination

that Brandon was at fault for the crash and R.W. was not at fault.

After extensive discovery, NJM offered Brandon the full policy

limit of $100,000. According to the order memorializing the

settlement, $29,027 was to be paid to "Ben Camacho, Pro Se

representing litigation expenses and settlement of the Xerox

Healthcare lien."

 In their appeal, plaintiffs argue the trial court erred in

denying their motion to compel discovery of the defendant officers'

internal affairs records and in granting summary judgment

dismissing his complaint. Plaintiffs contend they established: a

prima facie case of malicious prosecution and abuse of process

against defendant Motani, a prima facie case of supervisor

liability against Supervisor Markulic and a violation of the CRA.

They further argue the defendants are not entitled to qualified

immunity.

 10 A-5602-14T3
 II.

 Plaintiffs first argue the trial court erred in denying their

motions to compel production of the internal affairs (IA) records

of defendants Motani and Markulic. An appellate court reviews a

trial court's discovery order for an abuse of discretion, and

"should generally defer to a trial court's resolution of a

discovery matter, provided its determination is not so wide of the

mark or is not based on a mistaken understanding of the applicable

law." State ex rel. A.B., 219 N.J. 542, 554 (2014) (internal

quotation marks omitted). We discern no abuse of discretion in

the courts' rulings.

 The initial discovery period ended May 5, 2013, was extended

by consent to July 4, 2013 and extended once again by court order.

Plaintiffs appeal from discovery orders dated August 28, 2013,

June 11, 2014 and December 10, 2014.

 The first of these orders addressed a motion by plaintiffs,

seeking to compel more specific answers to interrogatories and the

production of documents. In a written statement of reasons, the

trial court addressed each of plaintiffs' requests for more

specific answers to interrogatories, granting some requests and

denying others. Plaintiffs' request to compel documents was denied

because they failed to attach a copy of their Notice to Produce,

making the court unable to rule on the motion.

 11 A-5602-14T3
 The second discovery order concerned plaintiffs' motion for

reconsideration, which was heard by a different judge.

Reconsideration of the denial of their request for more specific

answers on certain interrogatories was denied. In support of

their motion for reconsideration, plaintiff submitted the Notice

to Produce previously omitted from their motion.

 Plaintiffs contended Motani's deposition testimony was

inconsistent with his employment and discipline history and that

"any internal investigation reports and employment records" must

be compelled for use as substantive evidence of municipal

liability, for credibility purposes in cross-examining Motnai and

to determine if he is concealing any other disciplinary actions

or investigations. The motion for reconsideration was denied.

 The third discovery order, December 10, 2014, denied

plaintiffs' motion to compel more specific answers to

interrogatories. To support their arguments, plaintiffs relied

on Groark v. Timek, 989 F. Supp. 2d 378 (D.N.J. 2013)5 and Groark

5
 In Groark, the plaintiff alleged two Atlantic City Police
Officers beat him up without provocation and then filed false
criminal charges. Plaintiff learned in discovery that from 2001
to 2013, the two officers had collectively been the subject of
approximately 78 complaints similar to his - excessive force,
assault, threats, improper search and arrest, and malicious
prosecution, for which they were never disciplined. Groark, supra,
989 F. Supp. 2d at 383. The court found the requested documents
"directly relevant" to plaintiff's claim pursuant to Monell v.

 12 A-5602-14T3
v. Timek, No. 12-1984, (D.N.J. July 18, 2014). The trial court

provided the following reasons on the order:

 Defendants have complied with plaintiff's
 reasonable discovery requests and info sought
 by way of records is not relevant and not
 discoverable under Bayer v. [Township of]
 Union, 414 N.J. Super. 238 [(App. Div. 2010)].
 Plaintiff misreads Groark which is not binding
 on this court. Requested info unlike in
 Groark is not relevant or likely to lead to
 relevant information.

 During the course of discovery, defendants produced Internal

Affairs index cards for Motani and Markulic for the five years

preceding the crash, which revealed only three complaints filed

against the two of them.

 Despite these disclosures, plaintiffs argue they are

"entitled to discovery of investigations of dissimilar claims,"

including "the entirety of the IA index cards for the defendant

officers" and "both pre[-] and post-incident IA files, not only

files from five years preceding the incident . . . ."

Furthermore, they contend defendants must provide unredacted IA

index cards to cure their allegedly "vague and undefined" request

for "a representative sample of Howell Township's IA files for ten

Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d
611 (1978) and also noted the documents would "reveal whether
plaintiff can support his argument that Atlantic City's Internal
Affairs process and investigations are a sham." Groark, supra,
989 F. Supp. 2d at 400.

 13 A-5602-14T3
(10) years preceding the incident." Plaintiffs claim this

discovery is essential to their claim for municipal liability

against Howell Township for alleged civil rights violations.

 Defendants argue the discovery sought is irrelevant, the

Groark cases are distinguishable and non-binding, the discovery

requests were too vague, and this discovery issue is moot because

plaintiffs did not oppose defendants' motion for summary judgment

as it related to municipal liability.

 To compel discovery of police personnel records to establish

a police officer's liability for civil rights violations, a

plaintiff must establish "some factual predicate making it

reasonably likely that information in the file could affect the

officer's credibility" and "that the file may reveal prior bad

acts that bear 'peculiar relevance' to the issues at trial." Bayer

v. Twp. of Union, 414 N.J. Super. 238, 273 (App. Div. 2010)

(quoting State v. Harris, 316 N.J. Super. 384, 387, 398 (App. Div.

1998)). This policy is attributable to the "significant public

interest in maintaining the confidentiality of police personnel

records." Ibid. (quoting State v. Kaszubinski, 177 N.J. Super.

136, 138 (Law Div. 1980)).

 Plaintiffs make two principal arguments. First, they argue

the trial court erred in its application of the law by not

following the Groark cases. However, those cases are clearly

 14 A-5602-14T3
distinguishable from the facts here and, in any case, New Jersey

courts are not bound by the decisions of federal district courts.

State v. Witczak, 421 N.J. Super. 180, 194 (App. Div. 2011)

(quoting State v. Coleman, 46 N.J. 16, 36 (1965), cert. denied,

383 U.S. 950, 86 S. Ct. 1210, 16 L. Ed. 2d 212 (1966)); In re

Application of Summit & Elizabeth Tr. Co., 111 N.J. Super. 154,

166 (App. Div. 1970). The trial court's application of New Jersey

law was not an abuse of discretion.

 Second, plaintiffs argue all the requested IA documents must

be produced to resolve "credibility issues" because testimony

provided by Motani and Markulic regarding their understanding of

the IA records pertinent to them was inconsistent with the

information in the IA records that were produced. During their

testimony, both officers noted they were unsure about those facts.

While any disparity between the officers' recollection and the

records provides some fodder for cross-examination, it falls far

short of establishing a factual predicate that makes it "reasonably

likely that information in the file could affect the officer's

credibility" on any significant point or "that the file may reveal

prior bad acts that bear 'peculiar relevance' to the issues at

trial." Bayer, supra, 414 N.J. Super. at 398.

 15 A-5602-14T3
 We therefore discern no abuse of discretion in the trial

court's denial of plaintiffs' motion to compel further production

of IA records.

 III.

 Plaintiffs next challenge the order granting summary

judgment, dismissing their claims. They contend the trial judge

failed to afford them the inferences to which they were entitled

pursuant to Rule 4:46-2; that they established a prima facie case

on each of their claims for malicious prosecution, abuse of

process, violation of the CRA, and supervisor liability; and that

defendants are not entitled to qualified immunity.

 In reviewing a summary judgment decision, we apply the same

standard as the trial court. Murray v. Plainfield Rescue Squad,

210 N.J. 581, 584 (2012). Viewing the evidence "in the light most

favorable to the non-moving party," we determine "if there is a

genuine issue as to any material fact or whether the moving party

is entitled to judgment as a matter of law." Rowe v. Mazel Thirty,

LLC, 209 N.J. 35, 41 (2012) (citing Brill v. Guardian Life Ins.

Co. of Am., 142 N.J. 520, 529 (1995)). We review questions of law

de novo, State v. Gandhi, 201 N.J. 161, 176 (2010), and need not

accept the trial court's conclusions of law. Davis v. Devereux

Found., 209 N.J. 269, 286 (2012).

 16 A-5602-14T3
 A.

 The essential elements of a cause of action for abuse of

process are: "the filing of a complaint, without probable cause,

that was actuated by malice, that terminated in favor of the party

now seeking relief, and that caused the party now seeking relief

to suffer a special grievance." LoBiondo v. Schwartz, 199 N.J.

62, 72 (2009). This tort is based upon the alleged malicious

filing of civil litigation. Id. at 89-91; Pitcock v. Kasowitz,

Benson, Torres & Friedman, LLP, 426 N.J. Super. 582, 585 n.1 (App.

Div. 2012); see also Pressler & Verniero, Current N.J. Court Rules,

cmt. 4.2.7 on R. 4:6-2 (2017) (noting malicious prosecution claims

are based on criminal actions and malicious abuse of process claims

are based on civil actions). Because plaintiffs' allegations are

not based on the filing of any civil action,6 this claim is not

available and was properly dismissed.7

6
 Violations of Title 39 are regarded as "quasi-criminal in
nature, despite the fact that a traffic offense is neither a crime
nor a misdemeanor." No Illegal Points, Citizens for Drivers
Rights, Inc. v. Florio, 264 N.J. Super. 318, 332 (App. Div. 1993).
7
 Because we review judgments and not the reasons stated for
judgments, it is of no consequence if a trial judge employs
different reasoning to reach a conclusion that is correct. Do-
Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001).

 17 A-5602-14T3
 B.

 We next turn to plaintiffs' malicious prosecution claim.

There are four essential elements to a claim of malicious

prosecution: "(1) a criminal action was instituted by this

defendant against this plaintiff; (2) the action was motivated by

malice; (3) there was an absence of probable cause to prosecute;

and (4) the action was terminated favorably to the plaintiff."

LoBiondo, supra, 199 N.J. at 90. Because a complaint was filed

against Brandon that was ultimately dismissed, our focus is on the

second and third elements of this cause of action, which are

interrelated.

 Actual malice is "the intentional doing of a wrongful act

without just cause or excuse." Jobes v. Evangelista, 369 N.J.

Super. 384, 398 (App. Div.), certif. denied, 180 N.J. 457 (2004).

To satisfy the element of actual malice, "the underlying suit must

have been initiated primarily for a purpose other than that of

securing the proper adjudication of the claim on which it was

based." Westhoff v. Kerr S.S. Co., 219 N.J. Super. 316, 324 (App.

Div. 1987), certif. denied, 109 N.J. 503 (1987). Summary judgment

may be properly granted where the plaintiff presents only a tenuous

evidential basis for actual malice. Ibid.

 As evidence that Motani acted with malice, plaintiffs cite

his heated conversation with Ben before he issued the complaint,

 18 A-5602-14T3
in which Ben was screaming and using vulgarities and expletives.

While it is true that the complaint was issued shortly after

Motani's conversation with Ben, any nexus between that

conversation and the decision to issue the complaint is sheer

speculation, as the record shows Motani pursued an investigation

and gathered the information he stated he relied upon before the

conversation occurred. Plaintiffs also contend a jury could find

Motani issued the summons as a favor to R.W. and that he was

friendly with several officers who are friends and acquaintances

of R.W. These contentions are even more obviously dependent upon

speculation, which is insufficient to create a genuine issue of

fact that Motani was motivated by malice.

 Malice may be inferred from a "finding that the defendant had

neither probable cause for the criminal complaint nor a reasonable

belief in probable cause." Jobes, supra, 369 N.J. Super. at 398.

This is the focus of plaintiffs' argument that Motani acted with

malice.

 To determine whether probable cause existed, "a court must

look to the totality of the circumstances and view those

circumstances 'from the standpoint of an objectively reasonable

police officer.'" State v. Basil, 202 N.J. 570, 585 (2010)

(citations omitted) (quoting Maryland v. Pringle, 540 U.S. 366,

371, 124 S. Ct. 795, 800, 157 L. Ed. 2d 769, 775 (2003)).

 19 A-5602-14T3
 Probable cause cannot be defined with
 scientific precision because it is a
 practical, nontechnical conception addressing
 the factual and practical considerations of
 everyday life on which reasonable and prudent
 men, not legal technicians, act. Probable
 cause is a fluid concept--turning on the
 assessment of probabilities in particular
 factual contexts--not readily, or even
 usefully, reduced to a neat set of legal
 rules. Although probable cause is more than
 a mere suspicion of guilt, it is less than the
 evidence necessary to convict a defendant of
 a crime in a court of law. Between those two
 extremes, it is safe to say that a police
 officer has probable cause to arrest a suspect
 when the officer possesses a well grounded
 suspicion that a crime has been or is being
 committed.

 [Ibid. (citations and internal quotations
 omitted).]

 In short, "[t]he substance of all the definitions of probable

cause is a reasonable ground for belief of guilt." Brinegar v.

United States, 338 U.S. 160, 175, 69 S. Ct. 1302, 1310, 93 L. Ed.

1879, 1890 (1949) (citations and internal quotation marks

omitted)).

 In arguing that Motani lacked probable cause plaintiffs

attack the sources of information he stated he relied upon: (1)

the bank surveillance video, (2) SCART diagrams, (3) R.W.'s

statements and (4) Brandon's injuries. Plaintiffs contend these

sources of information are insufficient to form an objective basis

for probable cause.

 20 A-5602-14T3
 As we understand plaintiffs' criticism of Motani's reliance

upon the video, it is that the frame of the video cited did not

provide adequate support for Motani's conclusion that Brandon

appeared to be two feet east of the solid white fog line, in the

southbound lane of the road and approximately twenty feet south

of a utility pole.

 Plaintiffs challenge Motani's reliance upon the SCART

diagrams on the ground that he admitted sharing his opinion with

the SCART team that Brandon was crossing the street from left to

right and was in the roadway when struck and assumed SCART took

his opinion into consideration.

 Plaintiffs contend R.W.'s statements provide no support for

a finding of probable cause because he did not observe Brandon

prior to impact and could not tell if Brandon was moving or

crossing the street. They concede Brandon was struck in the

roadway, but cite a statement from Motani that the roadway consists

of both the travel lane and the shoulder.

 Finally, plaintiffs challenge Motani's reliance upon

Brandon's injuries, which he conceded did not alone establish

whether Brandon was moving in the moments before impact.

 The points plaintiffs raise about each of these sources of

information are valid grounds for challenging the probative value

of evidence to support a conviction. These isolated attacks do

 21 A-5602-14T3
not, however, vitiate probable cause because they ignore credible

grounds for that determination both in the sources plaintiffs have

criticized and in other facts of the investigation that Motani has

cited.

 Let us first acknowledge it is undisputed that Brandon was

not in a crosswalk when he was struck. Although R.W. did not see

Brandon before the impact, he consistently stated he was in the

southbound lane of the road when the accident occurred. There is

no evidence to the contrary. A logical inference, which Motani

was entitled to rely upon, was that Brandon was in the travel lane

when R.W. struck him. After he was hit, Brandon was lying in the

street, not on a shoulder of the road. Although the injuries on

the right side of his body did not establish he was crossing the

street from the left to the right, the injuries were consistent

with that theory. Moreover, it is immaterial whether Brandon was

walking from left to right or right to left or walking at all, in

light of the reasonable inference he was in the travel lane and

not in a crosswalk at the time of impact. Further, Motani's

reliance upon the diagrams prepared by SCART is not corrupted by

the fact he shared his impression with the SCART team because

there is no evidence that the diagrams were prepared based upon

his opinion. To the contrary, the report reflects that the SCART

team photographed the crash scene and measured the crash scene

 22 A-5602-14T3
using the LTI Impulse 200 laser as part of the preparation of the

scene diagram. Motani testified that the "stepping stones" for

his determination of fault included the "specific measurements

from the SCART team, which were obviously not dependent upon his

opinion." In light of this support for a finding of probable

cause, it is of no consequence that Motani found additional support

in the "distorted" image he observed in the surveillance tape.

 We are satisfied these facts support an "honest belief" there

was "a good or sound chance" of establishing that Brandon was

guilty of violating N.J.S.A. 39:4-36(a)(2). See LoBiondo, supra,

199 N.J. at 93. Because plaintiffs failed to present prima facie

proof of two essential elements of their malicious prosecution

claim, that the action was motivated by malice and that there was

an absence of probable cause to prosecute, summary judgment was

properly granted, dismissing the malicious prosecution claim.

 C.

 Plaintiffs' argument regarding supervisor liability merits

only limited comment.

 In Schneider v. Simonini, 163 N.J. 336 (2000), cert. denied,

531 U.S. 1146, 121 S. Ct. 1083, 148 L. Ed. 2d 959 (2001), the

Supreme Court adopted a "recklessness or deliberate indifference"

standard for supervisor liability that is applicable to

plaintiffs' claim. Id. at 373. This requires the plaintiff to

 23 A-5602-14T3
establish "that: (1) the supervisor . . . failed to supervise the

subordinate official; (2) a causal link exists between the failure

to . . . supervise and the violation of the plaintiff's rights;

and (3) the failure to . . . supervise amounts to deliberate

indifference" or recklessness. Ibid. (citation omitted). The

Court stated "[t]he knowledge element . . . requires proof that

the supervisor was aware of facts from which an inference could

be drawn that the subordinate was acting in an unconstitutional

manner that carried a substantial risk of causing serious harm."

Id. at 373-74.

 Plaintiffs contend the requisite level of reckless

indifference was established here by evidence that purportedly

proved Markulic's "neglect and non-action" in signing off on

Motani's police report. They suggest Markulic should have

personally investigated the facts to confirm the accuracy of

Motani's report. No authority is cited to support the premise

that Markulic had a responsibility to personally verify the facts

contained in a subordinate's report or that the failure to do so

amounted to deliberate indifference. In any event, as we have

determined Motani did not lack probable cause for the issuance of

the complaint, there can be no causal link between any alleged

failure to supervise and a violation of Brandon's rights. In the

 24 A-5602-14T3
absence of proof of this essential element, the claim was properly

dismissed.

 D.

 In arguing their claim for violation of the CRA was

erroneously dismissed, plaintiffs merely rely upon the arguments

they advanced regarding the dismissal of their malicious

prosecution and abuse of process claims. As we have noted, those

arguments lack merit.

 Qualified immunity "shields government officials from a suit

for civil damages when 'their conduct does not violate clearly

established statutory or constitutional rights of which a

reasonable person would have known,'" Gormley v. Wood-El, 218 N.J.

72, 113 (2014) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818,

102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 410 (1982)), providing

the officials with "immunity from suit," ibid. (quoting Mitchell

v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed.

2d 411, 425 (1985)).

 The only constitutional transgression claimed by plaintiffs

is that the complaint was unsupported by probable cause. In light

of our conclusion that the complaint was adequately supported by

probable cause, the defendant officers were shielded from

liability under the CRA by qualified immunity.

 Affirmed.

 25 A-5602-14T3