**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0052-19T1

AKINTOLA HANIF MARTIN,

     Plaintiff-Appellant,

v.

UNIVERSITY HOSPITAL
NEWARK, RUTGERS
BIOMEDICAL AND HEALTH
SCIENCES, RYAN MCCABE,
AMBIKA ROY, ANDREA
HIDALGO, ILYA OSTROVSKY,
CHRISTINE GERULA, HARSH
P. SULE, ALFONSO WALLER,
PALLAVI SOLANKI,
GARRASTAZU NEYSA,
JUDITH SABOL, DIANE
TAYLOR, MONINA LOPEZ,
NIZAR SOUAYAH, MITCHEL
QUEANO, KYRA MAFFET,
CHRISTIANE MORTAGUA,
SCOTT ZUCKERMAN, DENISE
ALLISON, HUEY-JEN LEE, and
OBRYANT SEPULVEDA,

     Defendants-Respondents,

and

STATE OF NEW JERSEY,
ERIC RUSH, SARAH ARNOLD,
FLORENCE PIERRE, ABDUL
ALCHAKI, BLANDINA
BILLONES, ANUSHA
BOYANPALLY, JACINTA
ENWOROM, MERICA
MCCALLA, OLUWOLE A. TAIRU,
SABA KAHN, NEHA KOTHARI,
DEVASHIN SHAH, TAREK
JAZMATI, and JOHN SABATINO,

     Defendants.

_____

Argued October 14, 2020 – Decided November 24, 2020

Before Judges Fisher, Gilson, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-0127-19.

William Stoltz argued the cause for appellant (Law Offices Rosemarie Arnold, attorneys; Sheri Breen and William Stoltz, on the briefs).

William J. Buckley argued the cause for respondents University Hospital Newark, Ambika Roy, Neysa Garrastazu, Judith Sabol, Diane Taylor, Monina Lopez, Mitchel Queano, Kira Maffett, Christiane Mortagua, Scott Zuckerman, Denise Allison, and Obryant Sepulveda (Schenck, Price, Smith & King, LLP, attorneys; William J. Buckley, of counsel and on the brief).[1]

_____

[1] Plaintiff named Garrastazu Neysa and Kyra Maffett as defendants. Their actual names are Neysa Garrastazu and Kira Maffett.

Beth A. Hardy argued the cause for respondents Rutgers Biomedical and Health Sciences, Ilya Ostrovsky, and Harsh P. Sule (Farkas & Donohue, LLC, attorneys; David C. Donohue, of counsel; Beth A. Hardy, on the brief).

Patricia M. Wason argued the cause for respondent Ryan McCabe (MacNeill, O'Neill & Riveles, LLC, attorneys; Gary L. Riveles and Patricia M. Wason, of counsel and on the brief).

John D. North argued the cause for respondent Ryan McCabe on counts five through seven (Greenbaum, Rowe, Smith & Davis, LLP, attorneys; John D. North and Irene Hsieh, of counsel and on the brief).

Janet L. Poletto argued the cause for respondents Andrea Hidalgo, Christine Gerula, Alfonso Waller, Pallavi Solanki, and Nizar Souayah (Hardin, Kundla, McKeon & Poletto, P.A., attorneys; Janet L. Poletto, of counsel and on the brief; Robert E. Blanton, Jr., on the brief).

Russell J. Malta argued the cause for respondent Huey-Jen Lee (Orlovsky, Moody, Schaaff, Conlon & Gabrysiak, attorneys; Paul F. Schaaff, Jr., of counsel; Russell J. Malta, on the brief).

PER CURIAM

Complaining about defendants' treatment of him after he had a stroke, plaintiff Akintola Hanif Martin appeals the trial judge's orders reconsidering and vacating his prior order granting plaintiff's motion for leave to file a late tort claims notice and dismissing with prejudice plaintiff's tort causes of action

A-0052-19T1

for failure to file timely a tort claim notice as required by the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 14-4 (the TCA). Finding that the trial judge erred in not applying correctly the required legal analysis, not making all relevant factual determinations, and not conducting an evidentiary hearing before dismissing with prejudice plaintiff's tort claims, we reverse and remand.

Because this case comes to us on an appeal of the trial judge's dismissal with prejudice of plaintiff's tort claims, we assume all facts alleged by plaintiff to be true and give him the "benefit of all inferences that may be drawn from those facts." Feinberg v. N.J. Dep't of Envtl. Prot., 137 N.J. 126, 129 (1994).

On January 6, 2017, plaintiff had a stroke in his apartment. When he regained consciousness, he could not walk or talk, but was able to crawl into the hallway of his building, where neighbors found him and called 911. When defendants Ryan McCabe and Eric Rush (the EMT defendants) arrived, they did not identify themselves as being affiliated with a public entity nor wore anything that revealed that affiliation. They accused plaintiff of being on drugs, even though his neighbors told them that he was not on drugs, asked him to stand, and kicked him when he did not rise. They eventually placed him on a stretcher, restrained him, and moved him into an ambulance. Plaintiff did not notice any markings on the ambulance. Without providing

4

any stroke-related testing, medication, or treatment, the EMT defendants took him to defendant University Hospital Newark.[2]

At the hospital, the EMT defendants told the doctors, nurses, and other hospital staff members[3] who were treating plaintiff that plaintiff was on drugs and had no stroke symptoms. The treating defendants, who did not provide any indication that they were affiliated with a public entity, treated plaintiff like a drug-overdose patient. They put him in restraints, gave him antipsychotic and antianxiety medication, and placed him in a corner of the emergency room. They did not perform any stroke screening or diagnostic tests or administer medication to treat a stroke for at least five to six hours. A CT scan, which was read the following day, revealed that plaintiff had had a stroke.

Plaintiff remained at the hospital until January 20, 2017, when he was discharged to the Kessler Institute for Rehabilitation for in-patient treatment.

---

[2] Plaintiff alleges that Rutgers Biomedical and Health Sciences owns and operates University Hospital Newark and that the State of New Jersey owns and operates each of those entities.

[3] In his complaint plaintiff identified as "treating defendants," among others, Ambika Roy, Andrea Hidalgo, Ilya Ostrovsky, Christine Gerula, Harsh P. Sule, Alfonso Waller, Abdul Alchaki, Pallavi Solanki, Neysa Garrastazu, Judith Sabol, Diane Taylor, Monina Lopez, Nizar Souayah, Mitchel Queano, Kira Maffett, Christiane Mortagua, Scott Zuckerman, Denise Allison, Huey-Jen Lee, and Obryant Sepulveda.

A-0052-19T1

He stayed at Kessler until February 21, 2017, when he was transferred to another facility. He remained at that facility for approximately three weeks. He later received treatment from a neurologist.

According to plaintiff, the unnecessary delay in the treatment of his stroke caused him to suffer catastrophic injuries, including severe brain damage, total paralysis of his right arm, weakness in his right leg that requires him to use a cane, a facial droop on his right side, uncontrollable drooling, and severe aphasia. For three months after his stroke, plaintiff could not speak and had great difficulty moving. He was not able to conduct a coherent conversation until sometime in November 2018.

On November 12, 2018, plaintiff spoke about "his situation" with a friend, who advised him to consult with a lawyer because the people who had treated him might have done something wrong. Plaintiff does not recall that anyone previously advised him that the delay in his treatment could have caused his injuries. After his conversation with his friend, plaintiff obtained a copy of his hospital records and began to look for an attorney.

A-0052-19T1

On January 3, 2019, plaintiff submitted to the hospital, the State, Rutgers New Jersey Medical School, and Rutgers University [4] a notice of claim pursuant to N.J.S.A. 59:8-1. He based the claim on his allegations concerning defendants' failure to diagnose or treat timely his stroke, the assault by the EMT defendants, and the negligent hiring or supervision of employees. He asserted in his claim that he did not discover until November 12, 2018, that the delay in his diagnosis or treatment had caused his injuries.

On January 4, 2019, plaintiff filed a complaint. He claimed that defendants had breached their duty of care to him by failing to provide to him appropriate treatment in a timely manner and were strictly or absolutely liable for his injuries. He contended that defendant corporate entities were vicariously liable for the individual defendants and directly liable for negligently hiring, retaining, or training them. He asserted that, by kicking him, the EMT defendants had "inflicted the torts of assault and battery." He

---

[4] Rutgers Biomedical and Health Sciences indicated in an answer that plaintiff had improperly named as defendants Rutgers New Jersey Medical School and Rutgers University. Plaintiff subsequently amended his complaint to name Rutgers Biomedical and Health Sciences in lieu of those entities.

accused the EMT defendants and the treating defendants of violating his civil rights, citing N.J.S.A. 10:6-2.[5]

On the same date plaintiff also filed a motion to file a late notice of claim pursuant to N.J.S.A. 59:8-9. Plaintiff argued that his notice of claim was timely because the discovery rule tolled the accrual of his claims until November 12, 2018, when his friend suggested he contact a lawyer. Alternatively, plaintiff contended that he should be permitted to file a late notice of claim because he had demonstrated extraordinary circumstances. In support of that motion, plaintiff submitted his affidavit, in which he attested to the factual allegations contained in his complaint.

In his oral opinion, the trial judge stated his concern that plaintiff had not submitted a statement of a physician indicating that "there was severe cognitive impairment . . . . If we have that I think we have extraordinary circumstances." The trial judge stated his belief that he would not have to reach "the tolling issue" if he found extraordinary circumstances: "instead of going down that road with the so called unknown friend and having discovery on any contacts he had with the friend, . . . at the end of the day at the bottom line of this it's his cognitive abilities during this time period." The trial judge

---

[5] That cause of action, contained in the fifth count, was not dismissed and is not at issue in this appeal.

acknowledged that if plaintiff did not establish extraordinary circumstances, "we could further explore the tolling issue" and indicated that he was "not satisfied on this record there's enough here to toll, because I would need more information on the contact with the friend." He also found that "there are a ton of fact questions" and that defendants would not be prejudiced by allowing the late submission.

The trial judge initially held that he would "technically" deny the motion without prejudice "subject to the plaintiff submitting that [physician] certification." Plaintiff's counsel asked the trial judge to grant plaintiff's motion "subject to receiving" plaintiff's supplemental submission. Stating that "[w]e can do it either way," the trial judge agreed to plaintiff's counsel's request to grant the motion subject to receiving the supplemental submission. In an order dated March 15, 2019, the trial judge deemed plaintiff's notice of claim timely for purposes of N.J.S.A. 59:8-8 "PROVIDED, HOWEVER THAT" plaintiff serve the noticed parties "with a medical expert report certifying [plaintiff's] medical conditions from January 6, 2017 until November 12, 2018 . . . ."

Plaintiff responded to that directive by submitting a certification of neurologist Arthur Rothman. In his certification Dr. Rothman confirmed that

plaintiff had total paralysis of his right arm, weakness in his right leg requiring use of a cane, a facial droop on the right side of his face, memory loss, and Broca's aphasia, which caused him to speak "haltingly, with great effort and with paraphasic errors." He reported that plaintiff had told him that for the first month after his stroke, he was not able to speak or write and that he was not able to speak "in complete, but halting sentences until approximately November 2018." He also stated that plaintiff had told him that his treating physicians had not advised him that the delay in his diagnosis or treatment may have caused the severity of his injuries.

Reviewing plaintiff's treatment records, Dr. Rothman discerned that when plaintiff was admitted to Kessler on January 20, 2017, he was completely unable to communicate or understand anyone. After receiving extensive in-patient physical, occupational, and speech therapy, he was discharged on February 21, 2017, but continued to suffer from "severe aphasic difficulties, along with other serious physical impediments" and needed additional speech therapy "to full[y] recover his ability to initiate speech spontaneously and to communicate at the sentence level." Dr. Rothman determined that when plaintiff began to be treated by Dr. Venkatraman on April 11, 2018, plaintiff still had memory loss and "aphasia related speech issues." Dr. Rothman found

A-0052-19T1

no indication that any treating physician had advised plaintiff that his injuries were caused potentially by the delay in diagnosis and treatment of his stroke.

Dr. Rothman opined that plaintiff "continues to suffer from brain damage, severe aphasia, as well as a laundry list of other debilitating injuries as set forth above, which made getting around and talking about a potential malpractice claim all but impossible." He concluded that: (i) there was "no way that a lay person [like plaintiff] would have known that his condition was caused by the delay in diagnosis and/or treatment of his stroke . . . rather than being a natural consequence of . . . a stroke"; (ii) plaintiff would not have known about a potential claim against defendants "until someone with sufficient expertise in the fields of neurology and treatment of strokes advised him of such"; and (iii) because of his injuries, plaintiff "was not able to fully understand or communicate the circumstances of his injury until November 2018." He based the last conclusion in part on his belief that a stroke patient with severe aphasia "optimally recover[s] a certain level of ability to communicate within a 1- to 2-year period . . . . This is why [plaintiff] was not able to understand the causes and nature of his disabilities and their relationship to his treatment . . . until November 2018, almost 2 years after his stroke."

11

The EMT defendants, hospital, and some of the treating defendants submitted a written request to the trial judge, asking for limited discovery regarding the timeliness of plaintiff's notice of claim. They asserted that some of them had not been served with plaintiff's motion to file a late notice of claim and, thus, had been deprived of an opportunity to oppose it. They also contended that Dr. Rothman's certification was deficient, covering only six months of the twenty-two-month period set forth in the order, and failed to establish extraordinary circumstances justifying plaintiff's late filing of his notice of claim. In response, the trial judge directed defendants to file a motion.

Defendant McCabe moved for reconsideration of the March 15, 2019 order and dismissal of the tort claims against him. The other defendants followed suit, moving or cross-moving for reconsideration or for dismissal with prejudice of plaintiff's tort claims for failure to file timely a notice of claim. Defendants argued, among other things, that Dr. Rothman's certification failed to establish extraordinary circumstances that would justify

A-0052-19T1

the late submission of a notice of claim and that plaintiff's Facebook posts undermined plaintiff's assertion that he was cognitively impaired.[6]

Rejecting plaintiff's argument that defendants' motions were untimely, the trial judge considered defendants' motions and held that the accrual date of plaintiff's claim was January 6, 2017, the date plaintiff had the stroke. He based that conclusion on his factual findings that on that date, plaintiff knew: he had had a stroke; the EMT defendants had accused him of being on drugs and had kicked him; the "EMT defendants and the hospital delayed his treatment" and did not conduct appropriate screening or give him correct medication; and the treating physicians placed him in restraints like a drug-overdose patient and ignored him for six to seven hours. He declined to apply the discovery rule to toll the accrual date until November 12, 2018, the date of plaintiff's conversation with his friend, because "there's a failure to explain how that conversation revealed any new facts that he previously did not possess." The trial judge viewed the "outcome" of that conversation as "simply a friend advising him to go see a lawyer." The trial judge concluded that based on plaintiff's "social media posts . . . there is cognitive ability to understand what his condition is . . . at the latest in the spring or summer [of

---

[6] Defendants referenced Facebook posts from March and June 2017 and October 2018.

 A-0052-19T1

2017]. And I think it's just too late." The trial judge also found based on the social media posts that plaintiff had "knowledge that this was Rutgers." The trial judge acknowledged Dr. Rothman's conclusions, but nevertheless determined that "I just don't think that's enough to establish this evidence of cognitive inability to understand." The trial judge granted defendants' motions, vacated the March 15, 2019 order, and dismissed with prejudice plaintiff's tort claims for failure to file timely a notice of claim.

Plaintiff appeals, arguing that the trial judge erred in: (i) considering defendants' untimely motions; (ii) not tolling the accrual date until November 2018; and (iii) failing to find that extraordinary circumstances justified allowing plaintiff to file a late notice of claim.

As a threshold matter, we find unpersuasive plaintiff's argument that defendants' motions were untimely under Rule 4:49-2. The trial judge initially was inclined to deny plaintiff's motion without prejudice, but at plaintiff's request granted it provisionally, as set forth in bold capital letters in the order. The unambiguous wording of the order establishes that the judge did not intend it to be a final order on the timeliness of plaintiff's notice of claim, but instead gave plaintiff an opportunity to supplement his submissions on that

issue with a medical expert report. Thus, the time limitation of Rule 4:49-2 does not apply.

We review decisions to grant or deny motions to file late notices of claim pursuant to N.J.S.A. 59:8-9 under an abuse-of-discretion standard. D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 147 (2013); see also O'Donnell v. N.J. Tpk. Auth., 236 N.J. 335, 344 (2019) (noting N.J.S.A. 59:8-9 leaves the determination of whether a late notice may be filed to "the discretion of a judge of the Superior Court"). An abuse of discretion occurs when a trial judge's decision "was not premised upon consideration of all relevant facts, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005); see also State v. S.N., 231 N.J. 497, 515 (2018). A trial judge's interpretation and application of the TCA to undisputed facts is a legal determination that we review de novo. See Jones v. Morey's Pier, Inc., 230 N.J. 142, 153 (2017). We more closely examine those cases in which a filing of a late notice of claim was denied, "'to the end that wherever possible cases may be heard on their merits, and any doubts which may exist should be resolved in favor of the application.'" S.E.W. Friel Co. v. N.J. Tpk.

Auth., 73 N.J. 107, 122 (1977) (quoting Viles v. State, 423 P.2d 818, 821 (Cal. 1967)); see also Feinberg, 137 N.J. at 134.

The TCA governs when public entities are liable for their torts. Nieves v. Adolf, 241 N.J. 567, 571 (2020). To proceed with a tort claim against a public entity, a plaintiff must file with the public entity a notice of claim within ninety days of the action's accrual. O'Donnell, 236 N.J. at 345; see also N.J.S.A. 59:8-8. A court may grant a plaintiff who has not met that deadline leave to file a late notice of claim within one year of the accrual of the claim, provided the plaintiff demonstrates extraordinary circumstances that prevented a timely filing and the public entity has not been substantially prejudiced by the delay.[7] Id. at 346; see also N.J.S.A. 59:8-9. The failure to file "within ninety days under normal circumstances or within one year under extraordinary circumstances," bars a plaintiff from bringing a tort claim against a public entity. Ben Elazar v. Macrietta Cleaners, Inc., 230 N.J. 123, 133 (2007); see also N.J.S.A. 59:8-8(a). These TCA notice requirements "were not intended as a 'trap for the unwary.'" Lowe v. Zarghami, 158 N.J.

---

[7] A defendant must produce and demonstrate substantial prejudice under N.J.S.A. 59:8-9. See Mendez v. S. Jersey Transp. Auth., 416 N.J. Super. 525, 535 (App. Div. 2010). Because defendants do not argue that they were substantially prejudiced by any delay in the filing of plaintiff's claim and did not appeal the trial judge's finding of no prejudice, we do not consider the prejudice element of N.J.S.A. 59:8-9.

A-0052-19T1

606, 629 (1999) (quoting Murray v. Brown, 259 N.J. Super. 360, 365 (Law Div. 1991)).

Our Supreme Court requires trial judges determining the timeliness of a notice of claim under N.J.S.A. 59:8-8 to perform a "sequential analysis." Bayer v. Twp. of Union, 414 N.J. Super. 238, 258 (App. Div. 2010); see also Beauchamp v. Amedio, 164 N.J. 111, 118 (2000). The trial judge first must determine when the claim accrued. Bayer, 414 N.J. Super. at 258. The trial judge next must determine if the notice of claim was filed within ninety days of the accrual date, and, if not, whether extraordinary circumstances justify the late notice. Id. at 258.

Defendants contend that plaintiff's claims accrued on the day he had the stroke, January 6, 2017, while plaintiff argues the discovery rule tolled the accrual of his claims until November 2018 conversation with his friend. In determining when a cause of action accrues for purposes of the TCA notice requirement, "common law principles governing accrual of a tort claim apply." Ben Elazar, 230 N.J. at 127. Generally, the date of accrual for a tortious act is the date on which the tortious act occurred. Bayer, 414 N.J. Super. at 258. The discovery rule tolls the accrual date when "the victim either is unaware that he has been injured or, although aware of an injury, does not know that a

A-0052-19T1

third party is responsible."  Id.; see also Ben Elazar, 230 N.J. at 127 (finding that "[u]nder traditional equitable principles of our discovery rule, the date of the accrual of a claim . . . may be tolled when plaintiffs lack knowledge of fault of a third party").

Those accrual concepts apply in medical-malpractice cases, which "generally accrue[s] on the date that the alleged act or omission occurred." Baird v. Am. Med. Optics, 155 N.J. 54, 65 (1998).  The discovery rule tolls an accrual date in medical-malpractice cases "when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another."  Id. at 66.  "Critical . . . is the injured party's awareness of the injury and the fault of another." Ibid; see also Caravaggio v. D'Agostini, 166 N.J. 237, 246 (2001) (focusing on "whether the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another").

Generally, discovery-rule issues "will not be resolved on affidavits or depositions since demeanor may be an important factor where credibility is significant."  Lopez v. Swyer, 62 N.J. 267, 275 (1973).  If credibility is involved, a trial court should conduct an evidentiary hearing outside the presence of the jury.  Ibid.; see also The Palisades at Fort Lee Condo. Ass'n,

Inc. v. 100 Old Palisade, LLC, 230 N.J. 427, 452 (2017) (remanding case to trial court to conduct a Lopez hearing to examine evidence presented and "in its discretion, take testimony from relevant witnesses").

Once the accrual date has been determined and it has been found the plaintiff did not file the notice of claim within ninety days of the accrual date, the judge must then decide whether extraordinary circumstances justified the delay. Bayer, 414 N.J. Super. at 258. In determining whether extraordinary circumstances justify a delay in filing the notice of claim, a trial judge must focus on evidence of a plaintiff's situation during the ninety-day time period following the accrual date. See D.D., 213 N.J. at 151. Thus, it is critical for the judge to determine first the accrual date in order to assess the correct ninety-day time period. A judge then "must consider the collective impact of the circumstances offered as reasons for the delay." R.L. v. State-Operated Sch. Dist., 387 N.J. Super. 331, 341 (App. Div. 2006); see also Mendez, 416 N.J. Super. at 533.

Medical conditions meet the extraordinary-circumstances standard if they are "severe or debilitating" and have a "consequential impact on the claimant's very ability to pursue redress and attend to the filing of a claim." D.D., 213 N.J. at 149-50; see also Mendez, 416 N.J. Super. at 533 (noting that

"extraordinary circumstances can be found based on the severity of a party's injuries"). The question for the trial court is whether, when viewed objectively, a severe or debilitating injury impaired the plaintiff's ability to act during the relevant ninety-day time period. Id. at 151. Credibility issues warrant a hearing so that the trial judge can make findings of fact. Where there is a material factual dispute as to whether a medical condition was severe enough to impact significantly a plaintiff's ability to pursue legal action during the ninety-day period following the accrual date, the trial judge should conduct an evidentiary hearing.

As Justice Long explained twenty years ago in Beauchamp,

> Although occasionally the facts of a case may cut across those [accrual date and extraordinary circumstances] issues, they are entirely distinct. It is a common and regrettable occurrence for accrual and extraordinary circumstances to be treated as interchangeable and for courts and litigants to overlook the primary question of accrual and directly confront the ultimate question of extraordinary circumstances. What is important is to understand the framework of a Tort Claims notice analysis and to follow it.
>
> [164 N.J. at 119.]

Unfortunately, the trial judge failed to follow that framework.

The first question that had to be answered by the trial judge was when plaintiff's claims accrued. For the medical-malpractice claims, the decisive determination on that question is when plaintiff discovered or by the exercise of reasonable diligence should have discovered that his injuries were causally related to defendants' delay in diagnosing and treating his stroke. The trial judge never made that determination.

In his March 15, 2019 decision granting plaintiff's motion, the trial judge chose not to follow the required "sequential analysis." Instead, he leapfrogged over the first step, declining to determine the accrual date, and focused on extraordinary circumstances. He indicated that if plaintiff established exceptional circumstances with a supplemental medical-expert submission, he would not have to reach the issue of whether the discovery rule tolled the accrual date. Acknowledging the existence of a "ton of fact questions," he stated that if plaintiff failed to establish exceptional circumstances, he would "further explore the tolling issue" and "would need more information on the contact with the friend."

In his subsequent decision granting defendants' motions, the trial judge, with no additional information regarding plaintiff's conversation with his friend and no further exploration of the tolling issue, concluded that the

21

accrual date was the day plaintiff had the stroke. He based that conclusion on his finding that plaintiff on the day of his stroke knew that he had had a stroke and that the "EMT defendants and the hospital [had] delayed his treatment." The trial judge failed to make the critical determination as to whether and when plaintiff knew that defendants' delay had caused his injuries. The only evidence before the trial judge on that issue was plaintiff's affidavit and Dr. Rothman's certification. In his affidavit, plaintiff stated that he did not remember being told by anyone that the delay in treatment could have caused the extent of his injuries "until I was advised as such by my friend on November 12, 2018." In his certification, Dr. Rothman determined that no one had told plaintiff that the delay in treatment could have caused his injuries and opined that plaintiff would not have known that his condition was caused by defendants' delay in diagnosing or treating his stroke "rather than being a natural consequence of suffering a stroke" unless someone "with sufficient expertise in the fields of neurology and treatment of strokes" had told him.

Without conducting a hearing that would have enabled him to assess plaintiff's and Dr. Rothman's credibility, the trial judge apparently gave little or no weight to their sworn statements and instead focused on plaintiff's social media posts and what those posts indicated about plaintiff's cognitive capacity.

22

A-0052-19T1

Whatever those posts may have indicated regarding plaintiff's cognitive capacity, which was the focus of the trial judge's premature extraordinary-circumstances analysis, they shed no light on whether he knew or should have known that his condition was caused by defendants' delay in diagnosing and treating his stroke.

This is not a case in which the fault of a third party is apparent. See Caravaggio, 166 N.J. at 246 (giving as an example wrong tooth being extracted). Plaintiff may have had, as the trial judge found, the "cognitive ability to understand what his condition is" in the spring or summer of 2017. But that basic understanding of his condition does not mean that plaintiff had the ability or "'reasonable medical information'" to link his condition to the actions or inactions of defendants. Kendall v. Hoffman-La Roche, Inc., 209 N.J. 173, 193 (2012) (quoting Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 435 (2012)). Plaintiff reasonably could have understood that his condition was caused entirely by the stroke and may not have known or had reason to know that defendants' delay in diagnosing and treating the stroke caused or contributed to his condition.

Decisions regarding the accrual date and the existence of extraordinary circumstances required the resolution of a number of factual disputes between

the parties concerning plaintiff's medical condition, cognitive status, ability to pursue his claims, and knowledge he had or should have had about his condition, his claims, and defendants' public status. The resolution of those disputes called for credibility determinations that could not be made without a hearing. Instead of conducting a hearing, the trial judge decided on the papers that plaintiff's social media posts sufficiently discredited his and Dr. Rothman's sworn statements regarding his cognitive capacity and dismissed with prejudice plaintiff's tort claims. That was error.

In his findings, the trial judge did not differentiate between plaintiff's malpractice claims and his assault-and-battery claims against the EMT defendants. Plaintiff does not appear to argue that the discovery rule applies to the determination of the accrual date on the assault-and-battery claims. Plaintiff knew that the EMT defendants had kicked him on January 6, 2017. Neither plaintiff nor Dr. Rothman assert that plaintiff was unaware of the injuries caused by the alleged assault. Even if January 6, 2017, is the correct accrual date for the assault-and-battery claims, the judge's error in not conducting a hearing to resolve the factual disputes regarding the existence of extraordinary circumstances applies equally to plaintiff's assault-and-battery

24

claims.  Accordingly, we also reverse the trial judge's order dismissing those claims.

Reversed and remanded for an evidentiary hearing and new determination by the court.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0052-19T1